UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
EDGARDO DIAZ DIAZ,

                      :      **REPORT & RECOMMENDATION**

         Plaintiff,

                      :      **13 Cv. 2038 (PAC) (MHD)**

   -against-

                      :

THE CITY UNIVERSITY OF NEW
YORK <u>et al.</u>,             :

         Defendants.   :
------------------------------X

**TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:**

     <u>Pro</u> <u>se</u> plaintiff Edgardo Diaz Diaz is a former graduate student and adjunct lecturer at the City University of New York ("CUNY"). He commenced this lawsuit, asserting that CUNY and twenty-three individual university employees had violated his rights under a variety of statutes. These include Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e <u>et seq.</u>, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 <u>et seq.</u>, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 <u>et seq.</u>, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 <u>et seq.</u> and the Copyright Act, 17 U.S.C. §§ 501 <u>et seq.</u>

     Identifying himself as a Puerto Rican over the age of 50, plaintiff alleges, in a voluminous complaint, that defendants

1

discriminated against him on the basis of his national origin and age while he was a graduate student and an adjunct lecturer, that they retaliated against him for some of his complaints of discrimination, and that at least one defendant -- possibly assisted by a second -- misappropriated materials from his research notes, in violation of his rights under the Copyright Act. The temporal scope of his allegations ranges from 1993 until 2011. Based on these allegations, plaintiff names as defendants CUNY, Jeremy Travis, Edwin Melendez, William T. Kelly, Stephen Blum, Peter Manuel, Peg Rivers, David Olan, Louise Lennihan, Chase F. Robinson, Matthew Schoengood, Silvia Montalban, Sylvia Dapia, Isabel Martinez, Jane Bowers, Jose de Jesus, Lisandro Perez, Virginia Gardner, Edith Rivera, Martin Ruck, Frederick P. Schaeffer, Heather Parlier, and Rosemary Maldonado.

For the reasons that follow, we recommend that defendants' motion to dismiss be granted in part and denied in part.

I. The Complaint

Plaintiff has drafted a pro se pleading that offers, in nearly 100 pages of allegations and exhibits, an excruciatingly detailed, if jumbled, narrative of his version of his multi-decade life at CUNY, his theories as to how and why he was

2

mistreated, and a statistical presentation designed to demonstrate that "Latino" academics, particularly from Puerto Rico, have been denied equal treatment by the administrators and other decision-makers at CUNY. We summarize those allegations at some length.

Plaintiff utilizes the court's standard form "Complaint For Employment Discrimination" (Connell Decl. Ex. A at 000004-15)[1] and then attaches to it a long separate document, styled "Complaint", which embodies the details of his allegations and claims, together with 40 pages of documentary exhibits, comprising his series of submissions to the Equal Employment Opportunity Commission ("EEOC") starting in May 2011. (Id. at 000016-99). In the form complaint he lists the types of discrimination that he claims to have encountered, including failures to hire him and to promote him, termination of employment, unequal terms and conditions of employment, retaliation and "other acts", for which the reader is referred to his annexed "Complaint". (Id. at 000005-06).[2] He further asserts

---

[1] For ease of reference we use the pagination of the complaint that is provided by defendants in their motion papers. (Connell Decl. Ex. A).
[2] Plaintiff's brief summary in the form complaint states:

After I entered CUNY as an adjunct faculty and as a student who aspired to be promoted for better academic jobs, the employer used various methods to maintain my status as a student while students from non-minority groups were assisted by the school in their aim to get their Ph.D's. Among these methods are included the following: discrimination, sabotage to my professional development, intentional infliction of emotional distress, sabotage of my employment,

3

that the discrimination was based on his national origin --
identified as Puerto Rican -- and his age, now 60 years. (Id. at
000006).

In the more detailed pleading, plaintiff describes himself
as "a scholar in ethnomusicology, musician, composer and writer"
and specifies that his focus is on "music in Puerto Rico, the
Caribbean and Latin America." (Id. at 000018). He reports that he
was a graduate student at the CUNY Graduate School and University
Center ("GSUC") from August 1993 to May 2002, as well as during
one semester in 2009 (id. at 000019), and that he served as an
adjunct lecturer, apparently in Spanish, at various CUNY
constituent colleges -- most recently at the John Jay College of
Criminal Justice ("John Jay") -- from August 1993 to May 2011.
(Id. at 000018).

Plaintiff enrolled in GSUC in 1993 to pursue a PhD in
Caribbean and Latin American Music. (Id. at 000024). At the same
time he began to work as an adjunct lecturer in Spanish. (Id.).
He alleges that he intended to get a doctoral degree and obtain
employment, apparently on a tenure track, "at a major
university." (Id. at 000025). For whatever reason, plaintiff did

conspiracy to do copyright infringements, conspiracy for covering up
these copyright infringements, falsification of documents, and
primarily retaliation after I denounced their acts as discriminatory
on the basis of national origin and age. (Connell Decl. Ex. A at
000006).

4

not achieve his desired goal, although many of the operative events that he cites took place well over a decade ago.

According to the complaint, in about 1998 plaintiff "approached the stage of candidacy for [his] Ph.D.", and began applying for full-time positions at various universities, including CUNY. (Id. at 000025). He recounts that he asked his immediate professors, defendants Stephen Blum and Peter Manuel, for letters of recommendation, but they "ignored [his] request or refused to write the letters." (Id.). Confusingly, the complaint further seems to concede that at the time of plaintiff's alleged request for reference letters, he was nowhere near achieving a doctoral degree; indeed, plaintiff complains that the same two professors "refused to approve two dissertation proposals I made in 1997 and 2000 without any explanation." (Id.). He further alleges, quite generally, that "[o]ne after another my attempts to have a dissertation proposal approved were in vain", whereas other students, most of whom were white and less qualified than he was, had their topics approved. (Id. at 000026). Plaintiff adds that "[o]ne after another my attempts to get a full-time faculty position at CUNY and other universities . . . were in

vain" while his classmates, mostly Caucasian, got their PhDs and full-time faculty positions. (Id.).[3]

Plaintiff also proffers allegations designed to suggest that there was bias in CUNY's treatment of Hispanic students seeking music degrees. Thus he asserts that, according to the GSUC website in 2010, only one student of the 101 students reported to be earning their doctoral degrees in music between 1998 and 2008 was a member of a minority group. (Id. at 000026-27). He alleges that he was more qualified to earn a PhD than most of these 101 students in view of the fact that his works were more frequently cited in the Google Scholar index than all but three of them.

---

[3] Plaintiff seems to blame principally his faculty adviser, defendant Manuel, for his lack of success in pursuing his doctorate, and adds a variety of allegations about comments by Manuel that purportedly show either bias or some other failing on which plaintiff seems to premise his claims against that academic. Thus, for example, he alleges that defendant Manuel published an article in 1994 in which he tried to prove that Puerto Rican music was produced through appropriation, and that this "clearly suggested [defendant] discriminated against [plaintiff] on the grounds that [plaintiff] is Puerto Rican." (Id. at 000048-49). He goes on to allege that on May 1, 2008, he met with Manuel and when he expressed a desire to finish the dissertation, Manuel responded: "Well, you finish that dissertation if energies are left for you to finish." (Id. at 000061). A few days later, according to plaintiff, Manuel expressed strong reservations about plaintiff's scholarly abilities in a recommendation in which he assessed plaintiff's qualifications for a position in John Jay's department of Puerto Rican and Hispanic Caribbean studies, and insinuated that plaintiff had difficulties with written English. (Pl. Oppos. at Ex. 7). Around February 2009, plaintiff alleges, defendant sent him an e-mail saying "I want to see you finish your dissertation...I fear that it will be difficult. Your writing is very unclear, and it's not just a question of idiomatic English, but the general organization of sentences and paragraphs is unclear...You must try very very hard to organize your thoughts and write them coherently...I do worry about the dissertation as a whole." (Pl. Oppos. at Ex. 5; see also Connell Decl. Ex. A at 000061). On December 24, 2009, plaintiff says, he got into a heated exchange with defendant Manuel over a joint book project, during which defendant allegedly stated that they should not be "guided by either Cuban-nationalist diffusionism or resentful Puerto Rican nationalism." (Id. at 000049). Again, he implies that this comment reflects animus towards Puerto Ricans.

(Id. at 000027). Plaintiff also alleges that he has not yet obtained a PhD because he is Puerto Rican. (Id. at 000027-28).

Plaintiff reports that, because of unstated "unfavorable conditions" and "dire economic conditions", for which he blames CUNY, he withdrew as a graduate student in 2002. (Id. at 000035). Focusing on the preceding period, when he was a still student -- principally in the late 1990s -- plaintiff alleges that he witnessed defendant Stephen Blum "mistreat" "foreign students," including students from Asia and the Middle East and a Latina student. (Id. at 000028). He also alleges that he was told by a Latina CUNY employee that in the "late 1990s", at a party, defendant Dr. Allan Atlas had said that "Latinos are good performers but bad students"[4], a remark that plaintiff took as "signal[ing] the existence of an environment resulting in discriminatory practices at the GSUC, and areas under the influence of the GSUC music program." (Id. at 000028-29). At another point in his complaint, plaintiff points to his own statistical study purportedly showing that Latinos were under-represented in the CUNY faculty of the music program (allegedly 3%)[5] as compared to the percentage of the population they make up

---

[4] Plaintiff's EEOC complaint includes both this quote (id. at 000060) and a variation of it: "Latinos are good [in] performing music but are not good in fields like theory or musicology." (Id. at 000067).

[5] Plaintiff appears to calculate this number by looking at the surnames of faculty and speculating about their national origin. (Id. at 000030-35).

7

in New York City (28%). (Id. at 000030-35).[6] Plaintiff also alleges that Puerto Ricans were the most affected of all Latinos by cancellations in music courses in the entire Latino group. (Id. at 000032). In attempting to support this assertion, he states that, of all 401 music course sections to be taught in the Fall of 2011, none had Puerto Rican teachers. (Id. at 000032-33).

After plaintiff discontinued his studies at GSUC in 2002, he continued teaching at various CUNY entities as an adjunct lecturer. (Id. at 000036). He asserts that he was permitted to seek such employment, with the proviso that he arrange to be hired in academic departments other than music and that he therefore taught Spanish. (Id. at 000024, 000036).

Plaintiff alleges that in 2006, he and Prof. Manuel -- who was not only a faculty member in the music department, but also Caribbean music editor at Temple University Press -- began working together as "colleagues" in connection with the preparation of a book by Prof. Manuel. (Id. at 000039-40). In substance, plaintiff alleges that Prof. Manuel was working on the book and asked plaintiff for information that Mr. Diaz had compiled over the years from his own music research, to be used by Manuel in preparing his book manuscript. (Id. at 000040-41).

---

[6] Plaintiff does not bother to compare the percentage of Hispanic faculty to the percentage of Hispanic faculty applicants.

Plaintiff complains that Manuel's book -- which was titled "Creolizing Contradanza in the Caribbean" and published in 2009 - - "drew heavily" on plaintiff's notes, reproducing some of plaintiff's "original material" without giving him proper credit and instead mis-characterized plaintiff as a "student" rather than as his "colleague." (Id. at 000040-41, 000049).[7]

In plaintiff's submission in opposition to the dismissal motion, he proffers a somewhat different description of his interaction with Prof. Manuel. Thus, he includes an e-mail from Prof. Manuel, reciting that the professor had agreed to have plaintiff write one chapter for his book, but that plaintiff had been unable to complete it on time and as a result Manuel himself had finished that chapter. (Pl. Oppos. at Ex. 7; see also Connell Decl. Ex. A at 000041-42 (asserting that plaintiff was originally to write three chapters but confirming that Diaz ended up working on one chapter)). Moreover, plaintiff proffers exhibits reflecting that Prof. Manuel's book listed Mr. Diaz as a co-author for the chapter in question. (See Pl. Sur-Reply at Addenda 3-5).[8] Plaintiff does go on to complain that in the portion of

---

[7] It bears mention that the book was published in 2009 (id. at 000041), the same year that plaintiff re-enrolled as a graduate student at CUNY. (Id. at 000047).

[8] Ultimately, with respect to this chapter, plaintiff's name actually precedes Prof. Manuel's both in the table of contents as well as in the chapter heading. (Pl. Sur-Reply at Addendum 3). Plaintiff complains, however, about non-parties reversing this order. (Pl. Sur-Reply 9-10). Plaintiff references book reviews and subsequent citations of the article in which Prof. Manuel's name is mentioned first -- which plaintiff conspiratorially ascribes to Prof.

9

the chapter that Manuel completed, he expressed views on certain subjects that conflicted with Diaz's contribution to the book. (Connell Decl. Ex. A at 000044).[9]

According to plaintiff, in 2009 he started complaining about Prof. Manuel's conduct in regard to the preparation of the book chapter, but with no immediate response by CUNY. (Id. at 000036). He ultimately complained directly to GSUC President William Kelly on April 21, 2010 about this inaction and more generally about alleged discrimination against him in the music program based on his status as a Puerto Rican. (Id.). Defendant Kelly ultimately appointed defendant Martin Ruck as a fact-finder to look into plaintiff's complaints about the book and, on May 15, 2012, Prof. Ruck issued a report in which he concluded that plaintiff's work on defendant Manuel's book had been that of a student working with a teacher. (Id. at 000049-51; Pl. Oppos. at Ex. 11). Plaintiff considers Prof. Ruck's findings faulty and biased. (Id.).

Plaintiff undertakes a further lengthy and confusing narrative in which he suggests that various individuals employed

Manuel's "adamant stance that he wrote the referred chapter" and "campaign and pressure to present himself as author of works authored by the Plaintiff." (Id. at 9-10; see also id. at Addenda 4-5).

[9] This allegation seems at least in some potential tension with plaintiff's earlier assertion that Prof. Manuel had used plaintiff's research materials without giving him co-authorship credit. (Id. at 000040-41).

10

by CUNY conspired to cover up Prof. Manuel's alleged
misappropriation or distortion of plaintiff's contribution to the
book, sought to retaliate against him for his complaints, or
simply sought to discriminate against him. We briefly review the
highlights.

He alleges that defendant Blum intentionally participated in
defendant Manuel's scheme to appropriate his original data, and
that he did so in a variety of ways, although, as described in
the complaint, these challenged actions had no obvious relevance
to the book project. The purported misconduct that plaintiff
cites includes (1) insisting that if plaintiff returned as a
graduate student, Prof. Manuel would have to serve as his
adviser, (2) requiring that Profs. Manuel and Blum would have to
approve plaintiff's dissertation topic, (3) refusing to read all
versions of plaintiff's last dissertation proposal "on due time",
(4) denying having received one of plaintiff's dissertation
proposals, and (5) expressing the view that plaintiff would do
well to stop complaining, apparently about the faculty's
reception of his dissertation proposal. (Id. at 000045-46). All
of that said, plaintiff admits that Prof. Blum originally
"recruited" him in 1992 "to become a doctoral student for his
GSUC ethnomusicology division" (id. at 000039) and in 2009
approved his readmission to the music program as a graduate

11

student, apparently resulting in plaintiff re-enrolling for one semester that year. (Id. at 000047). Plaintiff further alleges that other defendants -- notably David Olan and Peg Rivers -- were not sufficiently helpful in locating a copy of one of his dissertation proposals that was apparently lost in transit to Prof. Blum. (Id. at 000047-48).

Plaintiff also makes reference to an internal report that was filed by defendant Silvia Montalban, the Affirmative Action Officer for John Jay College, accusing him of violating the college's policy against sexual harassment. (Id. at 000036). According to plaintiff, that report, issued April 29, 2010, was based on "a brief and unsupported complaint by a white student", was "exaggerated", and amounted to an act of retaliation in the wake of his April 21, 2010 complaint to GSUC Pres. Kelly about Prof. Manuel and institutional discrimination. (Id.). Although not mentioned in the body of the complaint, in plaintiff's EEOC submissions he says that a white "Italian" male student had complained about him to Ms. Montalban in November 2009 concerning certain comments that he had made in class while speaking in Spanish. (Id. at 000091).[10]

---

[10] Because plaintiff attached the EEOC materials to his complaint, we read their contents as incorporated in the pleading and thus relevant to a Rule 12(b)(6) analysis. See, e.g., ATSI Commc'ns, Inc. v Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

12

Plaintiff does not specify what consequence, if any, followed from the issuance of the report. All that he does say to buttress his assertion that the report had some impact is that John Jay President Jeremy Travis "retaliated" against him "by accepting a biased, unfounded and exaggerated report written by Affirmative Action Officer Silvia Montalban, without due process and against the terms of the contractual agreement between CUNY and the union, the PSC." (Id. at 000052).[11]

It is not evident from the pleading or the attached EEOC narratives whether the Montalban report, or its alleged acceptance by Pres. Travis, contributed to the April 2011 decision of John Jay -- where plaintiff was lecturing -- not to renew his contract, thus effectively terminating him as of June 2011. (See id. at 000061). Plaintiff acknowledges that an observation of his class in April 2011 by defendant Isabel Martinez had led to a negative evaluation of his teaching skills (id. at 000053, 000061), but he derides the accuracy of the evaluation and refers to the termination decision as retaliatory

---

[11] In plaintiff's EEOC materials, he frames his complaint vis-a-vis the Montalban report in somewhat different terms. There, he points out that the complaining student voiced his concerns in November 2009, that Ms. Montalban discussed the matter with Mr. Diaz in February 2010, and that the President approved the report in June 2010. (Connell Decl. Ex. A at 000091-92). Plaintiff labels this timeline, "expedite treatment," and vaguely contrasts it with the attention paid his own grievances. (Id. at 000092). He implies that CUNY was more concerned with an "informal complaint by a White male student" than his own. (Id.). If Mr. Diaz, here, is suggesting that CUNY maintains a pattern or practice of responding to non-minority complaints faster than others, he fails to present any evidence to this effect. Indeed, he appears to drop this argumentative thread altogether in his later filings.

in nature. (Id. at 000038). According to plaintiff, that decision amounted to retaliation because he had mentioned to John Jay President Travis in November 2010 that John Jay should "re-invigorate what I understood was a weak Affirmative Action program at the college." (Id. at 000069).[12] Seemingly inconsistently, however, he also refers to recommendations and decisions being made as early as October 2010 by several defendants that he not be reappointed, and asserts that these steps -- taken before his communication with Pres. Travis -- were also retaliatory, though he does not identify what they were retaliating for. (Id. at 000052-53).

According to plaintiff, the April 2011 retaliatory termination was preceded by another act of retaliation. He alleges that in the wake of his November 2010 comment to Pres. Travis, he was denied appointment to a teaching position in the Graduate School. (Id. at 000061). Specifically, he says that in December 2010 the GSUC announced that a Dr. Ben Lapidus, a Jewish white teacher and friend of Prof. Manuel, was to teach a Spring 2011 course in music from Cuba and Puerto Rico. (Id.). He further

---

[12] A copy of plaintiff's November 2010 e-mail communication to Pres. Travis and his response to it are included as an addendum to plaintiff's sur-reply submission. (Pl. Sur-Reply Addendum 2). In the body of plaintiff's e-mail, he complained about the handling of the student's sexual-harassment complaint about him, and Travis's response alluded to the fact that Mr. Diaz had a pending grievance in connection with that matter. (Id.). We infer from plaintiff's complaint that Travis later denied the grievance.

14

recites that in January 2011 he asked to teach that course.[13] (Id.). Eventually he was told that Dr. Lapidus would not be assigned to teach the course and that a then-current Graduate School faculty member would do so. (Id.). He grouses that he had better qualifications than Dr. Lapidus (as judged by the comparative number of citations their respective works, as listed by the Google Scholar index) (id. at 000081), and he alleges that one of the students told him that in fact Dr. Lapidus did handle some of the classes for that course. (Id. at 000061). Plaintiff views the failure of his belated effort to be hired for that course as retaliation for his earlier comments to Pres. Travis. (Id.; see Pl. Sur-Reply Addendum 2). He does note at one point, however, that he was later told that the rejection of his request to the GSUC had been based in part on the fact that the decision to appoint Dr. Lapidus had been made before he himself sought the position. (Id. at 000070).[14]

Plaintiff was notified in April 2011 that he was being terminated effective June 2011. (Id. at 000061). That step apparently triggered his filing of a charge with the EEOC on or

---

[13] As noted, plaintiff refers to his having applied for the position in January 2011, after the December 2010 announcement of Dr. Lapidus's appointment. (Id. at 000061; see also id. at 000068-69). At another point in his EEOC submission, he says that he contacted GSUC in December 2010, but does not specify whether this occurred before or after the announcement about Dr. Lapidus. (Id. at 000064, 000068).

[14] Plaintiff also mentions another proffered explanation by GSUC -- that when Dr. Lapidus was replaced, it was by a then-current Graduate School faculty member. (Id. at 000061).

15

about May 10 or 15, 2011. (Id. at 000006; see also id. at 000056). The series of detailed submissions that he provided to the EEOC, in which he complained of age and national-origin discrimination as well as retaliation, are attached to his complaint and largely reiterate -- in somewhat more coherent form -- the allegations found in the complaint. (Id. at 000056-99).[15]

Plaintiff names additional individual defendants as responsible, during the period 2010 and 2011, for various forms of what he refers to as "retaliation", including recommending or instructing others in their respective institutions not to hire or retain him (id. at 000052-53) or else simply not responding to his letters of complaint. (E.g., id. at 000052, 000054). Similarly, he seems to complain that, after his termination by John Jay and his EEOC charge, several defendants conspired, with retaliatory animus, to add a PhD requirement for a teaching position that he was interested in applying for at the Center of Puerto Rican Studies ("CENTRO"). (Id. at 000053-54).

In submissions to the EEOC, plaintiff lists a series of actions and decisions by CUNY entities that he claims were

---

[15] The EEOC found no likelihood of a violation and issued a right-to-sue letter to plaintiff on December 20, 2012, which he reports having received on January 4, 2013. (Pl. Oppos. 11). He then commenced suit on March 26, 2013 by filing his complaint with the Pro Se Clerk of this Court.

additional acts of retaliation by some of the defendants that assertedly post-dated his EEOC filing. Enlarging on his complaints about his treatmemt at CENTRO, he asserts that on June 6, 2011, CUNYfirst, the website in charge of advertising all jobs at CUNY, announced an opening for the job of "Distinguished Lecturer" at CENTRO. (Id. at 000084). The only requirements listed were a bachelor's degree and a "record of achievement in a profession or field related to anticipated teaching assignments." (Id. at 000085). Plaintiff alleges that he applied for this position by July 25, 2011 and participated in a telephone interview with the search committee on September 7, 2011, as did all of the other candidates. (Id. at 000085). He claims to have heard from someone that the interviewing committee subsequently recommended that he be interviewed by the President and other senior management of CENTRO, but the hiring process was then frozen, and on October 15, 2011 CENTRO amended the hiring requirements to include a PhD, thus excluding plaintiff from eligibility for the position, for which he believed he was the most qualified. (Id. at 000085). Plaintiff asserts that the addition of this new requirement was retaliation for his filing with the EEOC on May 10 or 15, 2011, a step about which CUNY was notified on or about August 9, 2011. (Id. at 000085, 000094). He also goes on to say that he complained to CENTRO about the change in hiring criteria and that the posting was then modified to

17

restate its original terms, but he alleges that no steps were then taken to fill the position. (Id. at 000088).[16]

In plaintiff's various EEOC filings -- although not explicitly in the body of his "Complaint" -- he alleges that, apart from his failure to gain appointment by CENTRO, he was denied a series of CUNY teaching positions in the period starting in June 2011, and he implies, albeit without explicitly so stating, that the refusals to hire him were either retaliatory for his EEOC filing or discriminatory. (Id. at 000096-96). Thus he asserts that he applied to a host of CUNY colleges for various listed positions in different fields. (Id.). These included a tenure-track position at Borough of Manhattan Community College, an Adjunct Assistant Professor slot at Queensboro Community College, an Adjunct Lecturer position at the same school, an Assistant Professorship at Hostos Community College, and an Adjunct Assistant Professorship at Brooklyn College. (Id.). He asserts that he was not even granted an interview for any of these positions. (Id.).

---

[16] Apart from this complaint, plaintiff also alleges that he had previously been working at CENTRO as the music editor of an e-magazine. (Connell Decl. Ex. A at 000085). He goes on to assert that he had the impression from the head of CENTRO, defendant Edwin Melendez, in June 2011, after he had filed his EEOC charge, that his position there was shaky and that he should consider focusing on getting his doctoral degree. (Id. at 000085-87). He further asserts that on at least one occasion another CENTRO employee denied him access to the office that he had used when editing the e-magazine. (Id. at 000053).

18

Plaintiff also alleges that his EEOC filing immediately resulted in a dramatic reduction of Latino faculty in the CUNY music departments, especially the Puerto Rican group: "For all CUNY claims concerning budget reduction, 401 new course sections were added, but only 4 were assigned to Cuban Americans and none to faculty from the remaining Latino groups. Among the 162 sections not yet assigned in May 2011, only one was given to a Latino faculty (a Puerto Rican) . . . . This defiance seems to be aimed especially at Puerto Ricans: all 6 part-time Puerto Ricans saw their workload of music offerings reduced and the number of faculty members of this group is likely shrunk from 7 to 4." (Id. at 000094).

## II. Defendants' Motion

Defendants have moved to dismiss the complaint on a host of grounds. First, they assert that the complaint is not compliant with the requirement of Rule 8 that the pleading contain a short and plain statement of the plaintiff's claims. (Defs. Mem. 8-10). Second, they argue that most of plaintiff's Title VII and ADEA claims are time-barred because plaintiff failed to file timely with the EEOC and failed to bring suit within the required time after receipt of a right-to-sue letter from the EEOC. (Id. at 10-12). They also assert that most of plaintiff's NYSHRL and NYCHRL

19

claims are time-barred because he failed to file suit within the three-year limitations period of these statutes. (Id.). In addition, on reply they assert that plaintiff's copyright claim is time-barred. (Defs. Reply Mem. 6-7). Third, defendants assert that plaintiff's claims against CUNY under the ADEA and state law are barred by sovereign immunity. (Defs. Mem. 12-14). Fourth, they ask for dismissal of plaintiff's employment-discrimination claims based on his failure to plead viable claims for national-origin discrimination, age discrimination or retaliation. (Id. at 14-20). Finally, defendants argue that plaintiff's claims against the individual defendants under Title VII and the ADEA must be dismissed since they are not subject to suit under those statutes (id. at 20) and that the state-law claims against those individuals fail as a matter of law because plaintiff does not allege that those defendants had any responsibility for adverse employment actions. (Id. at 20-21).

Plaintiff has responded by submitting another voluminous mass of paper (including exhibits) in opposition, as well as a slimmer sur-reply memo with annexed addenda. In substance he resists all, or virtually all, of defendants' arguments.

20

III. <u>Assessment of Defendants' Motion</u>

A. <u>Rule 8</u>

Defendants contend that plaintiff's prolix and meandering pleading does not comply with the requirement of Rule 8 that a complaint include "a short and plain statement of the claim" sufficient to give the defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Wynder v. McMahon</u>, 360 F.3d 73, 77 (2d Cir. 2004) (internal quotations omitted). "The statement should be short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'" <u>Salahuddin v. Cuomo</u>, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Proc. § 1281, at 365 (1969)). However, the jurisprudence involving Rule 8, traced from the <u>Salahuddin</u> decision through the Supreme Court's <u>Iqbal</u> ruling, does not suggest, as defendants argue, that dismissal is mandated when a complaint contains too much detail, especially when the plaintiff is proceeding <u>pro se</u>. <u>See</u> <u>Shomo v. State of New York</u>, 374 F. App'x 180, 182-83 (2d Cir. 2010). Indeed, pleadings "need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Erickson v. Pardus</u>, 551

21

U.S. 89, 93 (2007) (internal quotations omitted). "Dismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Salahuddin, 861 F.2d at 42 (citing Gillibeau v. City of Richmond, 417 F.2d 426, 431 (9th Cir. 1969)).

Notwithstanding its length and meandering account, the complaint fairly places the defendants on notice of the claims that plaintiff is asserting against them. Moreover, while not a model of clarity, plaintiff's complaint is not unintelligible nor does it consist of "a labrynthian prolixity of unrelated and vituperative charges that defied comprehension." Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir. 1972). Significantly, courts have recognized that it "is not unusual [for] a pro se litigant" to present "allegations [that are] not neatly parsed and include[] a great deal of irrelevant detail." Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005). Since most of the details in plaintiff's complaint are related to the substance of his claims, we conclude that he has sufficiently complied with Rule 8.

B. The Statute of Limitations Defenses

1. The Title VII and ADEA 90-Day Limit

In defendants' original papers they argued that plaintiff's Title VII and ADEA claims were untimely because he had waited more than 90 days from the receipt of the EEOC right-to-sue letter before filing this lawsuit. (Defs. Mem. 11-12) (citing 42 U.S.C. § 2000e-5(f)(1)). Plaintiff represents, however, that he did not receive the EEOC letter -- dated December 20, 2012 -- until January 4, 2013 (Pl. Oppos. at 11 & Ex. 4 (December 20 letter postmarked December 26, 2012)), and that hence his filing with the Pro Se Clerk on March 26, 2013 (docket no. 2) was within the 90-day period. In view of plaintiff's representation, this aspect of defendants' appeal for dismissal cannot be granted.[17]

---

[17] Plaintiff's assertion as to when he received the right-to-sue letter is in is his opposition memorandum and not in the form of a declaration or affidavit. Nonetheless, in view of his pro se status, we read his papers liberally in this respect as a proffer of facts that could be provided under penalty of perjury. See, e.g., Johnson v. Wright, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002) ("In light of [plaintiff's] pro se status, the Court will also deem the factual allegations contained in [his] briefs to supplement his amended complaint."); see also Vargas v. Chubb Grp. of Ins. Cos., 2002 WL 31175233, *1 n.3 (S.D.N.Y. Sept. 30, 2002) ("While ordinarily only affidavits and other forms of sworn testimony are considered in a summary judgment motion, [plaintiff] is unrepresented, and may not have understood that she should have made these factual assertions in an affidavit.").

23

2. The 300-Day Limit Under Title VII and the ADEA

Under Title VII and the ADEA, the plaintiff must first file a charge with a pertinent state or federal agency, a requirement with which plaintiff complied by filing on May 15, 2011 with the EEOC.[18] The statutory deadline in this case for that filing is 300 days from the date of the alleged wrongful act. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2); see, e.g., Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996). This exhaustion procedure is a precondition to bringing suit under Title VII and the ADEA, see Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Kassner v. 2d Ave. Delicatessen Inc., 496 F.3d 229, 237-38 (2d Cir. 2007), and failure to abide by that time limitation generally bars a plaintiff from bringing suit. See, e.g., Zipes, 455 U.S. at 392-98.

Since plaintiff filed with the EEOC on May 15, 2011 (Connell Decl. Ex. A at 000056), the limitations cut-off date for his Title VII and ADEA claims is July 19, 2010. Thus, of the claims articulated by the plaintiff, his sole ADEA claim and most of his

---

[18] In his form complaint, plaintiff reports that he filed on May 15, 2011, although the EEOC documents attached to the complaint contain a cover letter with a date of May 10, 2011. (Connell Decl. Ex. A at 000006, 000056). Moreover, plaintiff elsewhere reports having filed with the EEOC on May 12, 2011. (Id. at 000084, 000086, 000091, 000093). While we use the May 15 date throughout this report and recommendation, we note that no matter when in this five-day period plaintiff filed with the EEOC -- as regards the statutes of limitations at issue here -- the outcome of plaintiff's various claims is unaffected.

24

Title VII claims are barred.

The only allegation found in the complaint that may even arguably refer to age concerned a comment made by defendant Manuel in May 2008, in which he told plaintiff over lunch that he "could finish that dissertation if energies are left for you to finish." (Id. at 000061). Putting to one side whether this comment may anchor a colorable age-discrimination claim, to the extent that plaintiff alleges any adverse employment action by Prof. Manuel -- presumably consisting of not approving one or more dissertation topics or using plaintiff's research materials in his book without proper attribution -- those actions took place well before July 19, 2010. Accordingly, any conceivable ADEA claim is time-barred.

The Title VII claims that are barred include plaintiff's allegations concerning his inability to obtain approval of a dissertation topic (id. at 000025), defendant Manuel's use of plaintiff's research materials in his book (id. at 000039-44), defendants' purported retaliatory refusal to respond to plaintiff's letters to the GSUC administration complaining about discrimination (id. at 000036), and defendant Montalban's formal accusations against him under the CUNY Policy of Sexual

25

Harassment. (Id. at 000036).[19]


Plaintiff argues in his opposition to defendants' motion that none of his claims are barred because they amount to continuing violations. (Pl. Oppos. 10). Defendants respond that plaintiff fails to allege that his mistreatment reflected any "ongoing" policy of CUNY, and that other than conclusory assertions of anti-Puerto Rican bias, plaintiff "has failed to demonstrate, as he must, that the various incidents of which he complains 'collectively constitute one unlawful employment practice.'" (Defs. Reply Mem. 8 (quoting Jacobs v. Mostow, 271 F. App'x 85, 88 (2d Cir. 2008)). We agree.


The continuing-violation doctrine, insofar as applied to claims under Title VII and related federal statutes, was traditionally viewed as applicable if a plaintiff had experienced a continuous practice and policy of discrimination, in which case "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks and citations omitted); see also Gomes

---

[19] Plaintiff's reference in his numbered complaint to Pres. Travis "accepting" the Montalban report (id. at 000052) does not mention when this occurred; however, a reference to Pres. Travis "approv[ing]" the report (id. at 000092) -- which we take to be a reference to the same event -- provides a date of April 29, 2010. Accordingly, even if this allegation amounted to a Title VII claim, it would be untimely.

v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992). This principle has since been limited by the Supreme Court's decision in National R.R. Corp. v. Morgan, 536 U.S. 101 (2002), in which the Court held that "discrete discriminatory acts" -- including, for example, refusals to hire, failure to promote or terminations -- "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113-14. Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Id. In practice, then, the continuing-violation rule applies only to claims amounting to assertions of hostile-work environment or similar claims that "cannot be said to occur on any particular day" but rather are the product of events that take place "over a series of days or perhaps years." Id. at 115; see, e.g., Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 155-58 (2d Cir. 2012); Dimitracopoulos v. City of New York, 2014 WL 2547586, *7 (E.D.N.Y. June 4, 2014); Schwartz v. New York State Ins. Fund, 2012 WL 5587604, *6 (S.D.N.Y. Aug. 28, 2012).

In this case plaintiff's Title VII and ADEA claims -- however loosely defined -- concern discrete actions, including refusals to approve dissertation topics, failures to provide satisfactory references, refusals to hire or promote, issuance of a biased report on a sexual-harassment accusation, and

27

termination. (See supra pp. 2-19). Although plaintiff alleges at various points that CUNY has a practice or policy of discriminating against Hispanic or Puerto Rican academics (see, e.g., Connell Decl. Ex. A at 000026-27), "[d]iscrete acts of th[e] sort [alleged], which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." Chin, 685 F.3d at 157 (citing cases). In other words, allegations of "separate instances of alleged unlawful conduct, occurring at different times and under different circumstances, without a non-conclusory factual connection -- rather than a common policy under which all the actions were carried out" -- are insufficient to invoke the continuing-violation doctrine. Jackson v. New York, 523 F. App'x 67, 69 (2d Cir. 2013); cf. Falinski v. Kuntz, 38 F. Supp. 2d 250, 257 (S.D.N.Y. 1999) ("The courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of 'compelling circumstances.'").

     In sum, the ADEA claims and any Title VII claims arising prior to July 10, 2010 must be dismissed.

3. The Copyright Act Claim

As noted, plaintiff asserts what he characterizes as a copyright claim based on the alleged misuse of his research materials or his draft of a chapter or a portion of one for the book published by defendant Manuel. The limitations period for a claim under the Copyright Act is three years, 17 U.S.C. 507(b), see also Kwan v. Schlein, 634 F.3d 224, 228 (2d Cir. 2011), and begins to run from the time of discovery. See, e.g., Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 124 (2d Cir. 2014). Plaintiff, by his own account, learned of the asserted violation "as early as April 2009." (Connell Decl. Ex. A at 000036). Therefore, plaintiff's claim is time-barred.[20]

4. Claims under the NYSHRL and the NYCHRL

Barring certain exceptions which are not relevant here, the statutes of limitations under the NYSHRL and the NYCHRL are both three years. N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code § 8-502(d). Since plaintiff filed his lawsuit on March 26, 2013, the

---

[20] Plaintiff also tries to classify these claims under the Convention Establishing the World Intellectual Property Organization ("WIPO"), and the Berne Convention for the Protection for Literary and Artistic Works. (Connell Decl. Ex. A at 000017). The WIPO and the Berne Convention are international agreements. If plaintiff wants to file an application under them he must do so separately from his complaint here. WIPO, http://www.wipo.int/madrid/en/how_to/file/ (last visited Nov. 3, 2014).

29

limitations period under both statutes covers the period going back as far as March 26, 2010. Thus, claims arising prior to that date are presumptively time-barred.

Since the standards governing application of the limitations defense under the NYSHRL parallel those applicable to Title VII, see, e.g., Staff v. Pall Corp., 233 F. Supp. 2d 516, 527-28 (S.D.N.Y. 2002), aff'd, 76 F. App'x 366 (2d Cir. 2003) (applying the reasoning of Morgan to NYSHRL claims), plaintiff's state-law claims that arose earlier than March 26, 2010 cannot be pursued despite plaintiff's argument that they should be subjected to an exception for continuing violations. As for the claims under the NYCHRL, the analysis differs slightly, although we reach the same result.

In 2005 New York City enacted an amendment to the NYCHRL titled the Restoration Act, legislation that was intended to require a more liberal approach to the City's anti-discrimination statute than had been adopted in interpreting Title VII and the NYSHRL. See Williams v. New York City Hous. Auth., 61 A.D.3d 62, 72-73 & n.14, 872 N.Y.S.2d 27, 35 & n.14 (1st Dep't 2009). The impact of that legislation includes a rejection, in effect, of the Morgan narrowing of the continuing-violation rule. (Id.). Under New York precedent, the Restoration Act has the effect of

30

incorporating pre-Morgan standards developed in the federal courts, and thus "discrete acts can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice or policy.'" Dimitracopoulos, 2014 WL 2547586 at *7 (citing Williams, 61 A.D.3d at 72, 872 N.Y.S.2d at 35 & quoting Fitzgerald, 251 F.3d at 359). Under this approach, if a plaintiff experienced a continuous policy or practice of discrimination, the continuing-violation doctrine allows for the commencement of the statute-of-limitations period to be delayed until the occurrence of the last discriminatory act in furtherance of that discriminatory practice. (Id.).

Even if we construe plaintiff's allegations in the light most favorable to him, this more generous application of the continuing-violation doctrine does not save his NYCHRL claims predating March 26, 2010. Plaintiff offers a long history of discrete unsatisfactory dealings with numerous individual defendants starting in the mid or late 1990s, and he offers conclusory assertions of a policy, either in CUNY or in its separate colleges or in their respective music departments, to discriminate against Latinos or Puerto Ricans. (See supra pp. 2-19). Plaintiff fails, however, to plead any facts that would plausibly show the existence of a policy that linked events in

31

2010 and 2011 -- notably his failure to receive teaching positions that he desired and his termination in 2011 -- to any policy that may have caused him to be subjected to adverse actions in an earlier period. Indeed, the bulk of the concrete earlier actions that he alleges concern his inability to obtain approval of a dissertation topic, and, for reasons to be noted, that interaction involved his status as a student and not an employee of CUNY, and thus is beyond the scope of the NYCHRL. (See infra pp. 44-48). Moreover, although he cites his home-made statistical estimate of the small number of Latinos who were employed in the CUNY music departments in 2011, this cannot form the basis for a plausible assertion of a discriminatory practice or policy that led to actions against him, since it ignores his own concessions that he was invited by defendant Blum to become a graduate student in 1993, that he was hired as an adjunct lecturer at about the same time, that he remained a graduate student until 2002 and was allowed by defendant Blum to resume his graduate studies at his request in 2009, and that he remained employed in teaching positions at various colleges of CUNY from 1993 until 2011. In short, he does not plead a plausible basis for inferring that his negative interactions with various defendants prior to March 26, 2010 were a result of a CUNY practice or policy to discriminate against his demographic group

in employment practices.[21]

C. <u>CUNY Immunity</u>

Defendants next argue that CUNY itself should be dismissed as a defendant on plaintiff's claims under the ADEA, the NYSHRL and the NYCHRL. (Defs. Mem. at 12-14). They are plainly correct.

The Eleventh Amendment precludes suit under federal law against a state or its agencies absent explicit Congressional waiver of the state's immunity. <u>See</u>, <u>e.g.</u>, <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). The Supreme Court has held that Congress did not validly waive the states' Eleventh Amendment immunity from suit when it enacted the ADEA. <u>See Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62, 82-83, 91-92 (2000). Since CUNY is an arm of the state for purposes of sovereign immunity, <u>see</u>, <u>e.g.</u>, <u>Skalafuris v. City of New York</u>, 444 F. App'x 466, 468 (2d Cir. 2011)(citing <u>Clissuras v. City Univ. of New York</u>, 359 F.3d 79, 82 (2d Cir. 2004) (<u>per curiam</u>)), plaintiff's ADEA claim against the University is barred.

A similar result follows for plaintiff's NYSHRL and NYCHRL

---

[21] Formulaic assertions of conspiracy or discriminatory animus are not adequate to plead a claim under Title VII or the parallel State and City statutes. <u>See</u>, <u>e.g.</u>, <u>Basak v. New York State Dep't of Health</u>, 9 F. Supp. 3d 383, 390 (S.D.N.Y. 2014) (citing cases).

claims against CUNY insofar as he pursues them in federal court. Under the Eleventh Amendment a plaintiff may not press state-law claims in federal court against a state or its agencies unless the state has unambiguously consented to be sued in that forum. See, e.g., Raygor v. Regents of the Univ. of Minn., 534 U.S. 533, 540-41 (2002); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120 (1984). Neither the NYSHRL nor the NYCHRL reflect an unambiguous waiver of the immunity of New York State or its agencies to suit under their provisions in federal court, see, e.g., Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Dimps v. New York State Office of Mental Health, 777 F. Supp. 2d 659, 661-62 (S.D.N.Y. 2011), and accordingly those claims against CUNY must also be dismissed. See, e.g., Gengo v. City Univ. of New York, 479 F. App'x 382, 382-83 (2d Cir. 2012).

D. The Legal Adequacy of Plaintiff's Claims

Defendants next argue that plaintiff fails in whole or in part to plead viable claims of age or national-origin discrimination or retaliation under Title VII and the ADEA. (Defs. Mem. 14-20). They go on to assert that his claims are also deficient under the NYSHRL and the NYCHRL for similar reasons. (Id.). In pressing these arguments, they assert that insofar as many of plaintiff's complaints arise from his dealings with

34

defendants as a student rather than an employee, he is not protected by any of the anti-discrimination statutes that he cites. (Id. at 14, 16-18). They further argue that plaintiff does not plead plausible claims of adverse employment actions attributable to prohibited national-origin or age animus or discriminatory motivation. (Id. at 14-20). Finally, they assert that plaintiff fails to plead facially viable claims againt the individual defendants. (Id. at 20-12).

We first summarize the standards that apply to motions for dismissal on the face of the pleading. We then address defendants' substantive challenges to the allegations of the complaint. In doing so we take note that plaintiff's pleading, as supplemented by his motion papers, may be understood to assert a few legal theories not explicitly pled in the complaint.

### 1. Rule 12(b)(6) Criteria

We first address the standards applicable to the required 12(b)(6) analysis. When the court assesses such a motion, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982);

35

accord, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)), or "legal conclusions couched as factual allegations." Id. at 321 (quoting Port Dock & Stone Corp. v. Old Castle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007)).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Leibowitz v. Cornell Univ., 445 F.3d 586, 590 (2d Cir. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Supreme Court has since rejected this formulation, however, and hence a complaint is now subject to dismissal unless its factual allegations, if credited, make the claim "plausible." See Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560-61 (2007). The court thus

must look to the well-pled factual allegations and determine
whether, if true, those allegations would permit a reasonable
inference that the defendant is liable. See, e.g., Iqbal, 556
U.S. at 677-79. While this does not require a party to plead
"detailed factual allegations" to survive a motion to dismiss,
Starr, 592 F.3d at 321 (quoting Twombly, 550 U.S. at 555), it
does require that "'the plaintiff plead[] factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged.'" Id. (quoting
Iqbal, 556 U.S. at 678). Thus, "an unadorned, the-defendant-
unlawfully-harmed-me accusation" will not suffice. Iqbal, 556
U.S. at 678.

In short, the pleading must do more than "tender[] naked
assertion[s] devoid of further factual enhancement," id.
(internal quotation marks omitted), and in doing so must "'raise
a right to relief above the speculative level.'" ATSI Commc'ns,
Inc., 493 F.3d at 98 (quoting Twombly, 550 U.S. at 555). "This
standard 'is not akin to a probability requirement, but it asks
for more than a sheer possibility that a defendant has acted
unlawfully.'" Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d
703, 709 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 678). "Where
a complaint pleads facts that are merely consistent with a
defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678. Thus, although a plaintiff need not make out a prima facie case at the pleading stage, he must allege sufficient facts to plead a plausible Title VII claim. See, e.g., EEOC v. Port Auth. Of New York & New Jersey, __ F.3d __, 2014 WL 4799389, *6-7 (2d Cir. Sept. 29, 2014) (Equal Pay Act claim).

When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent. Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., ATSI Commc'ns, Inc., 493 F.3d at 98; Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999).

In view of plaintiff's status as an untutored pro se litigant, we read his complaint and motion papers liberally and derive from them the most reasonable claims and arguments that they may be read to imply. See, e.g., Triestman, 470 F.3d at 474-76. Moreover, liberal pleading rules apply "with particular stringency to [pro se] complaints of civil rights violations."

38

Phillip v. Univ. of Rochester, 316 F.3d 291, 293-94 (2d Cir. 2003). However, the "plausibility" standard articulated in Twombly and Iqbal applies to the pleadings of pro se plaintiffs as well as to those of represented litigants. See, e.g., Teichmann v. New York, __ F.3d __, 2014 WL 5314580, *3 (2d Cir. Oct. 20, 2014); see also Muhammad v. Juicy Couture/Liz Claibourne, Inc., 2010 WL 4032735, *2-3 (S.D.N.Y. July 30, 2010).

### 2. Rule 12(b)(6) Assessment

We have already noted that plaintiff fails to assert a timely claim under the ADEA and that large portions of his claims on other legal bases are also time-barred. Accordingly, we focus here on the pleading of arguably timely claims under Title VII and the New York statutes, although we also mention in passing certain of plaintiff's allegations that touch on events outside the applicable limitations periods. For reasons to be noted, plaintiff's discrimination claims do not pass pleading muster, and many of his retaliation claims are also legally inadequate.

### 3. The Title VII & ADEA Discrimination Claims

#### (i). Legal Standards

Under Title VII, it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA forbids employers to "discharge . . . or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).[22] Both the NYSHRL and the NYCHRL make it unlawful for an employer to discriminate against an employee "because of" his national origin or age. N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a).

Employment discrimination claims asserted under Title VII and the ADEA are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),[23] as are

---

[22] The ADEA protects only those persons who are forty years of age or older. Id. at § 631.

[23] Some courts have raised questions as to whether the McDonnell test applies to ADEA claims, an uncertainty based on a discussion in Gross v. FBL Fin. Servs., 557 U.S. 167 (2009), about the difference in wording between Title VII and the ADEA. See, e.g., Chacko v. Worldwide Flight Servs., Inc., 2010 WL 424025, *3 n.4 (E.D.N.Y. Feb. 3, 2010) (citing Kalra v. HSBC Bank U.S.A., N.A., 360 F. App'x 214, 215-16 (2d Cir. 2010). The Second Circuit, however, has held that this form of analysis does apply to the ADEA. See Delaney v.

claims arising under the NYSHRL and the NYCHRL. See Abdu-Brisson
v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). Under
the McDonnell Douglas framework, the initial burden is on the
plaintiff to establish a prima facie case of discrimination. See,
e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)
(citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,
252-53 (1981)). To meet that burden, a plaintiff must show that:
(1) he is a member of a protected class; (2) he was qualified for
the position he held; (3) he suffered an adverse employment
action; and (4) the adverse action took place under circumstances
giving rise to [an] inference of discrimination. Id.; Weinstock,
224 F.3d at 42; Gorzynski, 596 F.3d at 107. If he succeeds, the
defendant must proffer a neutral reason for its adverse action,
and the plaintiff then bears the burden of showing that the
proffered reason was untrue and a pretext for prohibited
discrimination. See, e.g., Delaney, 766 F.3d at 168; Gorzynski,
596 F.3d at 107.

    In 2002 the Supreme Court held, however, that the prima
facie case requirement under McDonnell Douglas is an evidentiary
standard, not a pleading requirement. See Swierkiewicz v. Sorema

---

Bank of America Corp., 766 F.3d 163, 167-68 (2d Cir. 2014); Gorzynski v.
JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010). In any event, for our
purposes the answer to this question is not significant. See, e.g., Dembin v.
LVI Servs., 822 F. Supp. 2d 436, 438 (S.D.N.Y. 1011); Chacko, 2010 WL 424025
at *3 n.4.

N.A., 534 U.S. 506, 510-12 (2002); accord Boykin v. KeyCorp, 521
F.3d 202, 212 (2d Cir. 2008). At the pleading stage, the
complaint need only comply with Rule 8, and thus must only
contain "a short and plain statement of the claim showing that
the pleader is entitled to relief," which will "give the
defendant fair notice of what the plaintiff's claim is and the
grounds upon which it rests." Swierkiewicz, 534 U.S at 512
(quoting Fed. R. Civ. P. 8(a)(2); Conley, 355 U.S. at 47). That
said, however, the High Court's subsequent decisions in Twombly,
550 U.S. at 569-70, and Iqbal, 556 U.S. at 678-79, now require
that the complaint contain such specific contextually dictated
factual allegations as will permit a "reasonable inference that
the defendant is liable for the misconduct alleged." Iqbal, 556
U.S. at 678. "A claim has facial plausibility when the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Turkmen v. Ashcroft, 589 F.3d 542, 546 (2d
Cir. 2009) (per curiam) (quoting Iqbal, 556 U.S. at 678).

   The question of how to reconcile Swierkiewicz with Twombley
and Iqbal was recently addressed by the Second Circuit in the
context of an Equal Pay Act ("EPA") claim. The Circuit read
Swierkiewicz to hold that Rule 8 did not impose a heightened
pleading standard for claims under Title VII and related

statutes, as compared with other claims. Port Auth., 2014 WL 4799389 at *6-7. But the panel further held that, notwithstanding the literal language of Rule 8 compelling only a short and plain statement of the claim, under Twombley and Iqbal the plaintiff in such cases must allege specific facts to permit a "reasonable inference that the defendant is liable for the misconduct alleged". Id. at 6. Indeed, in that case the Court found the complaint to be inadequate under Rule 8 and 12(b)(6) analysis even though it alleged that female attorneys for the Port Authority were paid less than male attorneys for the same work; the Court relied for this ruling on the failure of the pleading to specify the details that would demonstrate the functional equivalence of the work done by the female attorneys with that performed by the male lawyers. Id. at *9-11.

In short, although a Title VII plaintiff need not, per se, plead a prima facie case, he must allege sufficient facts to plead a plausible claim, and that evaluation requires a "'context specific inquiry.'" Kajoshaj v. N.Y.C. Dep't of Educ., 543 F. App'x 11, 15-16 (2d Cir. 2013) (quoting Iqbal, 556 U.S. at 679). For the court to deem a set of factual allegations plausible, the plaintiff must allege facts that allow the court, in substance, to infer the essential elements of his case. See, e.g., Knight v. State Univ. of New York at Stony Brook, 2014 WL 4639100, *5

43

(E.D.N.Y. Sept. 16, 2014); <u>Basak</u>, 9 F. Supp. 3d at 390 (citing cases); <u>Broomer v. Huntington Union Free Sch. Dist.</u>, 2013 WL 4094924, *9 (E.D.N.Y. Aug. 13, 2013); <u>Fernandez v. City of New York</u>, 2012 WL 2402642, *3-4 (S.D.N.Y. June 26, 2012) (dismissing claims under 42 U.S.C. §§ 1981 and 1983 because plaintiff failed to plead sufficient facts establishing a material adverse employment action); <u>see also</u> <u>Harris v. NYU Langone Med. Ctr.</u>, 2013 WL 3487032, *15 (S.D.N.Y. July 9, 2013); <u>Romaine v. New York City Coll. of Tech. of the City Univ. of New York</u>, 2012 WL 1980371, *2 (E.D.N.Y. June 1, 2012) ("The elements of a prima facie discrimination claim are . . . relevant to the determination of whether a complaint provides a defendant with fair notice and contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quoting <u>Chacko</u>, 2010 WL 424025 at *3).

### (ii). Claims Based on Plaintiff's Status as a Student

In assessing plaintiff's Title VII and ADEA discrimination claims, we start by noting that the statutes are limited to protecting rights involving an employment relationship. <u>See</u> 42 U.S.C. § 2000e-2(a)(1) (unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"); 29 U.S.C. § 623(a) ("It shall be unlawful for an employer to" discriminate based on age.); see, e.g., United States v. City of New York, 359 F.3d 83, 91 (2d Cir. 2004). This limitation has the effect of excluding from the welter of complaints by plaintiff any actions of defendants that affected him in his capacity as a student rather than as an employee of CUNY. In particular, as defendants argue, citing Stilley v. Univ. of Pittsburgh, 968 F. Supp. 252, 261 (W.D. Pa. 1996), "[a]ll issues pertaining to the completion of plaintiff's dissertation relate to plaintiff's role as a student and not as an employee." (Defs. Reply Mem. 5). More broadly, defendants assert that "[p]laintiff's allegations regarding his attempts to gain faculty approval for his dissertation (Compl. ¶ 4); his claims of discrimination in his attempts to obtain an advanced degree (Compl. ¶ 11); claims that white students who were less qualified than he had their topics approved (Compl. ¶¶ 7-8); and assertions of discriminatory treatment of students at GSUC (Compl. ¶¶ 12-14), are not in the employment context but in the educational context." (Defs. Reply Mem. 4). We agree.

Graduate students play a "unique dual role . . . as potentially both students and employees." Bucklen v. Rensselaer

Polytechnic Inst., 166 F. Supp. 2d 721, 726 (N.D.N.Y. 2001). When
assessing whether an individual is a "student" or an "employee"
for Title VII purposes, courts have looked to the nature of the
work performed by the individual, the relationship between the
individual and the educational institution, and the focus of the
challenged actions by the institution, and they have viewed the
pursuit of a post-graduate degree as representing the endeavors
of a student. See, e.g., Cuddeback v. Florida Bd. of Educ., 381
F.3d 1230, 1235 (11th Cir. 2004) (noting that courts typically
refuse to treat students as employees under Title VII "where
their academic requirements were truly central to the
relationship with the institution"); Bucklen, 166 F. Supp. 2d at
726 (dismissing Title VII claim as the claimed discrimination did
not concern terms and conditions of plaintiff's employment, but
rather his role as a student); Stilley, 968 F. Supp. at 261
(Title VII analysis must focus on employer-employee relationship
and "[a]ll issues pertaining to the completion of plaintiff's
dissertation relate to plaintiff's role as a student and not as
an employee"); see also Summa v. Hofstra Univ., 2011 WL 1343058,
*10 (E.D.N.Y. April 7, 2011), vac. in part on other gds., 708
F.3d 115 (2d Cir. 2013); Pollack v. Rice Univ., 1982 WL 296, *1
(S.D. Tex. March 29, 1982) (discrimination was "attendant to
[plaintiff's] capacity as a graduate student"); cf. Zie v. Univ.
of Utah, 243 F. App'x 367 (10th Cir. 2007). In short, plaintiff's

complaints about the refusal of faculty members to approve a dissertation topic or their decision as to who would supervise his doctoral dissertation efforts or comments by them about his writing style are all matters relating solely to his efforts as a student to obtain an advanced degree and hence are not covered by the protections of Title VII or the ADEA (or indeed by the cited State and City Human Rights Laws).

In resisting this conclusion, plaintiff asserts: (1) that he was a CUNY faculty member between 1993 and 2011 and taught there for 32 consecutive semesters, which was the period when most of the detected violations occurred (Pl. Sur-Reply, 2-3); (2) that his performance as a student and particularly his attempt to achieve a PhD were essential to his ability to obtain full-time tenure-track employment (Id. at 3-6), and (3) that defendant Manuel's assertedly discriminatory treatment toward him in connection with the book project was employment-related, because the book project was tied to plaintiff's aim to improve his job conditions at CUNY. (Id. at 5 n.1). These arguments plainly fail.

As the cited cases make plain, the fact that for a period of time plaintiff was both a student and a lecturer does not trigger coverage by Title VII (or the ADEA) of actions undertaken by faculty that are addressed to his performance as a student. As

for plaintiff's second point, all educational undertakings by a student are usually designed to advance his future career plans or at least have such an effect, but that fact does not alter the nature of the student's relationship to his school. He is still a student and not an employee. Finally, insofar as plaintiff complains about his treatment by Prof. Manuel in connection with the book project, he fails to plead a factual basis for inferring that Prof. Manuel's actions involved his employment relationship with CUNY or that any employment relationship existed with Prof. Manuel.[24] Hence, insofar as he may be seeking to plead a discrimination claim based on the book project -- which is in any event time-barred -- his complaint fails to do so.

(iii). <u>Assessment of the Employment-Related Claims</u>

This leaves for further consideration plaintiff's allegations of adverse actions by defendants, undertaken during the limitations period, that were addressed to his employment or efforts by him to obtain employment. We conclude that he fails to allege facts that suffice to permit an inference of age or national-origin animus.

---

[24] As discussed below, plaintiff also fails to plead a basis for deeming Prof. Manuel's conduct in this respect to be expressive of national-origin animus or retaliatory motivation. (<u>See</u> <u>infra</u> pp. 64-65).

48

In assessing the adequacy of plaintiff's pleading, we note
that he sufficiently alleges that he is a member of a protected
group, that is, he is Puerto Rican. (See, e.g., Connell Decl. Ex.
A at 000066). Plaintiff also alleges that, with respect to his
position as a John Jay adjunct lecturer, he was qualified for the
job. (See, e.g., id. at 000060). He further asserts, in more or
less direct terms, that he was competent to perform the functions
of the Graduate School position and the CENTRO slot for which he
applied in January and July 2011, respectively. (Id. at 000061,
000084-88).

Consistent with the elements of the plaintiff's initial
evidentiary burden, even if he must plead facts that suggest that
he was "competent to perform the job or is performing his duties
satisfactorily", see, e.g., Mario v. P & C Food Markets, Inc.,
313 F.3d 758, 767 (2d Cir. 2002) (addressing evidentiary burden);
Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010), he has done
so. In Slattery v. Swiss Reinsurance Am. Corp., the Circuit held
that to satisfy this second element as an evidentiary matter,
"all that is required is that the plaintiff establish basic
eligibility for the position at issue, and not the greater
showing that he satisfies the employer." 248 F.3d 87, 92 (2d Cir.
2001). Necessarily, the pleading burden must be similarly slight.

49

Judged by the allegations of the complaint, plaintiff was qualified for his position as an adjunct lecturer at John Jay since he had served as a lecturer for CUNY institutions for nearly two decades. (Connell Decl. Ex. A at 000060). Moreover, he allegedly received mostly positive reviews from his teaching evaluations (Id.; Pl. Oppos. Ex. 2), and his "published and unpublished work is often cited in specialized books and articles written in various languages." (Connell Decl. Ex. A at 000018). Furthermore, in view of his allegations that he was more qualified for the position at the GSUC than was Dr. Lapidus and that he was initially a favored candidate for the CENTRO Distinguished Lecturer slot (Id. at 000060-61, 000084-88), he sufficiently pleads competence for these positions.

Still more central to the potential viability of plaintiff's claims, he must plead that during the limitations period he was subjected to one or more adverse employment actions. See, e.g., Hicks, 509 U.S. at 506. Mr. Diaz's allegations as to conduct by defendants reflects, at least in a few instances, that he was the subject of an adverse employment action, although these instances are far more limited than seems implied by the long-winded complaint and other submissions.

An adverse employment action is any "materially adverse

50

change in the terms and conditions of employment." <u>Galabya v.</u>
<u>N.Y. City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000)
(internal quotation omitted); <u>accord</u>, <u>e.g.</u>, <u>Mathirampuzha v.</u>
<u>Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008). Examples of materially
adverse actions vary and can be context-dependent, but generally
include "termination of employment, a demotion evidenced by a
decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material
responsibilities, or other indices unique to a particular
situation." <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006)
(quoting <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003)).
Actions that are "trivial harms," that is, "those petty slights
or minor annoyances that often take place at work and that all
employees experience," are not materially adverse. <u>Burlington</u>,
548 U.S. at 68; <u>accord</u> <u>Hicks</u>, 593 F.3d at 165. Notably, Title VII
does not set forth "'a general civility code for the American
workplace.'" <u>Burlington</u>, 548 U.S. at 68 (<u>quoting</u> <u>Oncale v.</u>
<u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)); <u>see</u>
<u>also</u> <u>Basak</u>, 9 F. Supp. 3d at 391 ("[insulting] comments, whether
laced with discriminatory animus or simply hurtful or offensive,
do not themselves amount to an adverse employment action.");
<u>Pimentel v. City of New York</u>, 2002 WL 977535, *3 (S.D.N.Y. May
14, 2002) ("While adverse employment actions extend beyond
readily quantifiable losses, not everything that makes an

employee unhappy is an actionable adverse action."). In addition, negative assessments of an employee or criticisms of his performance or conduct -- without a concrete adverse change in plaintiff's conditions of employment -- do not themselves constitute adverse employment actions. See, e.g., Tepperwien v. Entergy Nuclear Operators, Inc., 663 F.3d 556, 570 (2d Cir. 2011); Sethi v. Narod, __ F. Supp. 2d __, 2014 WL 1343069, *16 (E.D.N.Y. April 2, 2014) (citing cases); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012) (citing cases); Adams-Martin v. Conn. Dep't of Dev. Servs., 2012 WL 878306, *9-10 (D. Conn. March 14, 2012) (citing cases).

Given these standards, the only adverse employment actions that plaintiff adequately pleads are the refusal of the GSUC to appoint him to a teaching slot in January 2011 (Connell Decl. Ex. A at 000061), the decision of John Jay not to renew his adjunct lecturer position in April 2011 (Id.), the failure of CENTRO to appoint him to the position of Distinguished Lecturer in the Fall of 2011 (Id. at 000084), and the failure of various CUNY schools to act favorably on his job applications beginning in June 2011. (Id. at 000096-97). The balance of plaintiff's allegations concern comments made to him by various CUNY officials and employees (e.g., id. at 000053, 000086), a report assessing a student's complaint about statements he had made in class (id. at

000021-22), an apparently negative class-performance evaluation
(id. at 000053), and the denial of an office key on apparently
one occasion (id. at 000053-54), all of which he seems to view as
either reflecting discriminatory animus or retaliatory motivation
or else as sufficiently injurious to him to amount to violations
of Title VII or the ADEA. None, however, amounts to the sort of
concretely harmful acts that qualify for coverage under the
statute.

The remaining requirement is that the plaintiff plead facts
that plausibly suggest that discriminatory animus was (in the
case of national-origin hostility) a motivating factor in the
challenged adverse employment action or (in the case of age
animus) the but-for cause of the adverse action. See Gross, 557
U.S. at 174-78 (distinguishing between Title VII and ADEA
standards).[25] An inference of discrimination may be established
from a variety of circumstances. These include "the employer's
criticism of the plaintiff's performance in ethnically [or age-
related] degrading terms; or its invidious comments about others
in the employee's protected group; or the more favorable
treatment of employees not in the protected group; or the
sequence of events leading to the plaintiff's discharge [or other
adverse employment actions]." Leibowitz v. Cornell Univ., 584

---

[25] See supra p. 40 n. 23.

F.3d 487, 502 (2d Cir. 2009) (quoting <u>Chambers v. TRM Copy</u> <u>Centers Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations omitted)). If the plaintiff relies on invidious comments, however, occasional so-called "stray remarks", particularly by individuals who are not involved in the later adverse employment action, are not sufficient to permit an inference of prohibited animus. <u>See</u>, <u>e.g.</u>, <u>Tomassi v. Insignia Fin. Grp.</u>, 478 F.3d 111, 114 (2d Cir. 20007); <u>Danzer v. Norden Sys., Inc.</u>, 151 F.3d 50, 56 (2d Cir. 1998); <u>see</u> <u>also</u> <u>Chao v. Mt. Sinai Hosp.</u>, 476 F. App'x 892, 896 (2d Cir. April 17, 2012).

Plaintiff fails to plead a case for prohibited age or national-origin animus on the current complaint. As we have noted, insofar as he seeks to assert a claim under the ADEA, the claim is untimely. (<u>See</u> <u>supra</u> pp. 24-25). In any event, plaintiff offers no allegations that even remotely reflect circumstances from which any age animus could be inferred in the various adverse employment actions that plaintiff cites, much less age animus that could have been the but-for cause of such adverse actions.[26]

---

[26] Plaintiff refers in his motion papers only to an alleged comment by Prof. Manuel that plaintiff might be able to complete his dissertation and perform additional teaching work "if, by the time you finish your dissertation there is some energy left to you." (Pl. Oppos. Mem. at 28). This comment (which is pled somewhat differently in the complaint (<u>see</u> Connell Decl. Ex. A at 000061), in whatever context it was made, is on its face devoid of age animus, and in any event, as a "stray comment" by someone who is not identified as a decision-maker for the colorable adverse employment actions pled by the plaintiff, it cannot buttress an inference of age animus triggering such

As for national-origin animus, plaintiff's allegations attempt to plead a basis for this inference in several ways. Thus, he cites some comments of several defendants (who were apparently not decision-makers) that he suggests betray an anti-Puerto Rican bias. (Connell Decl. Ex. A at 000048-49, 000061; see also id. at 000028). Plaintiff also alleges that on one specific occasion he was denied a position (with the GSUC) for which he was more qualified than the person chosen (Dr. Lapidus), who was not Puerto Rican. (Id. at 000061). In a further attempt to plead a factual basis for inferring animus towards Puerto Ricans, plaintiff offers a purported statistical case, which involves his rough approximations of the number of Latino academics in the CUNY music departments at one point in time, and presses some statistics on the career progress of a number of students who he speculates are non-Puerto Rican, and otherwise engages in general and conclusory assertions that Puerto Ricans (and possibly other Latinos) were disfavored, at least in non-performance music studies. (Id. at 000030-35).

None of these allegations offers a plausible ground for inferring animus to plaintiff based on his national origin, much less that such animus was a motivating factor in the termination of his position at John Jay or the denial to him of appointments

_____

adverse actions.

55

in other CUNY institutions. First, according to plaintiff's own pleading, he was continuously employed in an academic capacity at a series of CUNY colleges for a period of nearly two decades. (See, e.g., id. at 000036). Second, that employment continued despite his failure, after many years, to attain a doctoral degree. (Id. at 000060). Third, some of the quoted statements by several defendants, made many years before any adverse employment action, do not remotely reflect any such bias, and others do not amount to anything more than the sort of "stray" remarks that cannot be used to support the required inference. See, e.g., Chao, 476 F. App'x at 896 (citing cases); Danzer, 151 F.3d at 56; Altman v. New Rochelle Pub. Sch. Dist., 2014 WL 2809134, *10 (S.D.N.Y. June 19, 2014). Fourth, the hiring of Dr. Lapidus by GSUC offers no basis for the required inference. As we note elsewhere, plaintiff conceded at one point in his EEOC papers that he did not apply for this position until the month after the school had already chosen Dr. Lapidus, thus entirely negating the implication that the choice was driven by national-origin animus. (Connell Decl. Ex. A at 000061, 000070).[27]

---

[27] The narrative about this job position comes only in plaintiff's submissions to the EEOC. Our citation is to one of the documents that plaintiff provided to the EEOC, and the events to which it refers are not mentioned in the body of plaintiff's complaint, though the narrative is attached to it. Curiously, at other points in plaintiff's submissions to the EEOC -- also not referred to in the body of the complaint but attached to it -- plaintiff seems to say that he contacted the GSUC about the graduate teaching position in December 2010, not January 2011, but he does not indicate that he did so before the December announcement that Dr. Lapidus had been chosen (id. at 000064, 000068). Moreover, a few pages later he again seems to imply that he applied after the Lapidus announcement. (Id. at 000070).

Fifth, there is no suggestion in the complaint of a basis to infer that hiring and termination decisions were made at the University level rather than by the individual colleges. It bears emphasis that each of the adverse actions took place in a different college -- the termination of plaintiff's lectureship at John Jay (id. at 000070), the denial of a teaching position at the Graduate School (id.), the failure to appoint him to a posted position in the fall of 2011 at CENTRO (id. at 000084), and the denial of various of his job applications at Borough of Manhattan Community College, Queensboro Community College, Hostos Community College and Brooklyn College. (Id. at 000096-97). Absent plausible evidence (or equivalent factual allegations) that all of these administrations were walking in lockstep, there is no ground to infer that any national-origin animus by one or more individuals in one part of CUNY infected decision-makers elsewhere with the same animus. Cf. Gengo v. CUNY, 2011 WL 1204716, *4 (E.D.N.Y. March 28, 2011) (describing promotion-decision procedures at CUNY colleges), aff'd mem., 479 F. App'x 382 (2d Cir. June 15, 2012). Sixth, the statistical proffer on academic demographics that plaintiff cites involves a comparison of "Latino" teachers in CUNY music departments with the percentage of Latinos in the population of New York City -- a meaningless comparison in that it assumes, with no evident basis, that "Latino" applicants for these academic positions will mirror

the Latino share of the general population of the City.[28]
(Connell Decl. Ex. A at 000031).


Finally, the pleading itself offers a number of obvious
explanations other than anti-Puerto Rican animus for the adverse
decisions about which plaintiff complains. Thus, as noted, at one
point plaintiff concedes that his application for the Graduate
School position was communicated to the decision-makers in
January 2011, approximately one month after Dr. Lapidus was
selected for the position. (Id. at 000061). Thus, his allegation
that he was more qualified than Dr. Lapidus is irrelevant if
Lapidus was chosen before plaintiff had applied and in any event
Lapidus was replaced by a then-current Graduate School faculty
member. (Id.). As for the discontinuance of plaintiff's position
as adjunct lecturer at John Jay, he appears to concede that a
student had complained of misbehavior by him in a class in late
2009, with the result that a school report apparently found some
basis for the complaint. (Id. at 000090-92). He further concedes
that he was subject to class observation in the Spring of 2011

---

[28] We note that the Second Circuit has previously held, in a suit challenging a
tenure decision, that even a comparison of frequency of tenure approval
between the relevant universes of applicants (in that case, gender-based) is
not itself a basis to infer discrimination against the individual plaintiff.
See Zahorik v. Cornell Univ., 729 F.2d 85, 95 (2d Cir. 1984). See also Drake
v. Delta Air Lines, 2005 WL 1743816, *6 (E.D.N.Y. July 21, 2006) (citing
Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 877 (2d
Cir. 1997) and noting that probative statistical evidence may be combined with
other evidence to support inference of discrimination for purposes of opposing
summary judgment).

and that the resulting assessment was negative. (Id. at 000053, 000083). Although he might be able to demonstrate that these issues were pretextual, he alleges no facts that would permit a plausible inference that they were a mask for animus based on his status as a Puerto Rican.

Plaintiff's allegations concerning the posted position CENTRO fail as well, insofar as he may be heard to assert that the stoppage of the hiring process and the shifting criteria for hiring were intended to exclude him based on his national origin. He proffers no facts or allegations to this effect[29] and, indeed, in context it appears that he is principally contending that the failure by CENTRO to hire him in the Fall of 2011 was retaliatory rather than based on national-origin animus. (Id. at 000084, 000091, 000094). Finally, his allegations regarding the failure of numerous other CUNY institutions to hire him as a result of his many job applications starting in June 2011 also fail since he offers no indication that he was qualified to teach the various subjects that his applications targeted or that the decision-makers at these various schools shared the purported anti-Puerto Rican animus that he ascribes to other individuals within the capacious scope of CUNY. (Id. at 000096-97). Indeed, he never alleges that these rejections of his applications were

---

[29] In fact, the person he implicitly accuses of a biased refusal to hire him at CENTRO was himself Puerto Rican. (Connell Decl. Ex. A at 000086).

triggered by anti-Puerto Rican bias and instead simply asserts that none of the applications led to an interview or to his being hired, a pattern that he ascribes to retaliatory animus. (Id. at 000096-97; see id. at 000091).[30]

In sum, as currently pled, the complaint fails to state a plausible claim of national-origin discrimination under Title VII.

b. The Title VII Retaliation Claims

Plaintiff alleges that all (or virtually all) of the adverse employment actions that are potentially viable are attributable not only to national-origin animus but also to retaliatory motives. The pertinent statutory provision, found in section 704(a) of Title VII, specifies that

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees .
> . . because he has opposed any practice made an
> unlawful employment practice . . . because he has made

---

[30] Plaintiff makes repeated references to these schools' alleged failures to comply with Executive Order 11246. (Connell Decl. Ex. A at 000096-97). In brief, this President Johnson-era order promotes "equal opportunity in Federal employment" by prohibiting discrimination among federal contractors and other related entities and requires these businesses to undertake affirmative action to ensure equal opportunity for protected groups. Exec. Order No. 11246. We need not substantively address the implications of plaintiff's assertions in this regard, because it is eminently clear that "a private employment discrimination action can not be maintained under the Order." Morris v. Amalgamated Lithographers of Am., Local One, 994 F. Supp. 161, 172 (S.D.N.Y. 1998); accord Hooda v. Brookhaven Nat. Laboratory, 2010 WL 2079739, *1 (E.D.N.Y. May 19, 2010).

a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing
under this subchapter.

42 U.S.C. § 2000e-3. To state a Title VII claim for retaliation,

the plaintiff must allege that (1) "he engaged in protected

participation or opposition under Title VII, (2) that the

employer was aware of this activity, (3) that the employer took

adverse action against the plaintiff, and (4) that a causal

connection exists between the protected activity and the adverse

action, i.e., that a retaliatory motive played a part in the

adverse employment action." Cifra v. G.E. Co., 252 F.3d 205, 216

(2d Cir. 2001); see also Kelly v. Howard I. Shapiro & Assocs.,

716 F.3d 10, 14 (2d Cir. 2013); Hicks v. Baines, 593 F.3d 159,

169 (2d Cir. 2010); Basak, 9 F. Supp. 3d at 392; Attenborough v.

Constr. & Ge. Bldg. Laborers' Local 79, 691 F. Supp. 2d 372, 389

(S.D.N.Y. 2001).


To qualify as protected conduct, the actions of a plaintiff

who "opposes" asserted misconduct must rest on a good-faith and

reasonable belief that the conduct that he is challenging

violates the federal statute. See Summa, 708 F.3d at 126.

Moreover, the causal connection that the plaintiff must show in a

retaliation context is more stringent than the required link in

the case of claimed discrimination. Rather than simply showing

that retaliation animus was "a motivating factor" in the adverse

61

action, he must demonstrate that it was a "but-for" cause. See
Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517,
2522-23, 2528-33 (2013). This stricter test must inform our
assessment of the plausibility of plaintiff's allegations of
allegedly retaliatory conduct.

The standards for a retaliation showing differ in one other
way from the substance of a discrimination claim. Unlike the case
with Title VII claims of discrimination, the complained-of
adverse action need not be limited to steps taken by the employer
that affect the terms, conditions or status of employment, or
those that occur in the workplace; in this respect, the scope of
the retaliation provision is broader than that of Title VII's
substantive discrimination provision. See Burlington N. & Santa
Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Regardless of
whether the adverse conduct by the employer altered the
conditions of the plaintiff's employment, "plaintiff must show
that a reasonable employee would have found the [employer's]
challenged action materially adverse, 'which in this context
means it might well have 'dissuaded a reasonable worker from
making or supporting a charge of discrimination.'" Id. at 67-68
(quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir.
2006)). This assessment is contextual; "the significance of any
given act of retaliation will often depend upon the particular

circumstances. Context matters." Id. at 69. Hence, the assessment must necessarily be fact-specific, since "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. (quoting Oncale, 523 U.S. at 81-82 (1998)).

A plaintiff may make his showing of a causal connection between his protected activity and a subsequent adverse action in one of two ways. He "can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse action.'" Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Although some courts in this circuit "have found that 'a passage of two months between the protected activity and the adverse employment action seems to be the dividing line,'" O'Neal v. State Univ. of New York, 2006 WL 3246935, *15 (E.D.N.Y. Nov. 8, 2006) (quoting Cunningham v. Consol. Edison, Inc., 2006 WL 842914, *19 (E.D.N.Y. Mar. 28, 2006), the Second Circuit has found sufficient indication of causation based on adverse acts

occurring as long as four, six or even eight months after protected activity. See, e.g., Summa, 708 F.3d at 127-28 (discussing Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), and citing cases). Alternatively, the plaintiff may establish causation by proffering "evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (citing DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)); see, e.g., Figueroa v. Weisenfreund, 255 F. App'x 595, 597 (2d Cir. 2007); Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).

Plaintiff here contends, in substance, that he "opposed [a] practice made an unlawful employment practice." See 42 U.S.C. § 2000e-3(a). Thus, he states that he suffered "retaliation after I denounced their acts as discriminatory on the basis of national origin and age." (Connell Decl. Ex. A at 000006). He proceeds then to label as "retaliation" a wide variety of comments and actions by numerous individual defendant over a period of years.

Plaintiff does not clearly identify which actions that he cites constitute protected conduct on his part, but his allegations mention a number of steps that he took that,

64

liberally construed, may constitute such conduct.[31] Thus he alleges that on April 21, 2010 he wrote to GSUC Pres. Kelly concerning principally his concerns about Prof. Manuel's use of his materials in Manuel's book, but he states that in the same communication he "also denounced discriminatory practices at the music program on the ground that I am Puerto Rican." (Connell Decl. Ex. A at 000036; see also id. at 000050 (describing letter to Pres. Kelly)).[32]

Subsequently, plaintiff alleges, in November 2010 he communicated with John Jay Pres. Travis about the need to "give due attention to areas covering Employment Discrimination & Affirmative Action". (Id. at 000061; see Pl. Sur-Reply Addendum 2). As articulated, this allegation does not explicitly say that Mr. Diaz was protesting discrimination in his communication to

---

[31] We note that plaintiff reports having complained of various forms of discrimination at various times after he dropped out as a student in 2002, but notably in or around 2009, in the wake of his disagreement with Prof. Manuel over the use of his materials in the professor's book. (E.g., id. at 000051-52). As pled, plaintiff's allegations as to his book dispute with Prof. Manuel offers no suggestion of a violation of Title VII, that is, that it involved prohibited animus; absent any such indication of animus, plaintiff could scarcely have had a reasonable belief that his protest about the book issue raised a colorable question under Title VII or more generally reflected national-origin or age discrimination. In any event, putting to one side whether complaints about purported misconduct by Prof. Manuel can amount to protests against violations of Title VII, at present we focus on those alleged protests against discrimination that come within or near the limitations period since, as we shall see, some were followed by alleged adverse actions that trigger timely colorable claims.

[32] Plaintiff also mentions in passing a 2009 letter that he sent to Pres. Kelly, but he does not specify whether it addressed colorable discrimination issues or simply Prof. Manuel's handling of the book project or other unrelated topics. (Id. at 000036).

Pres. Travis, but he attaches a copy of his e-mail to his motion papers. (Id.). In that document he offers his endorsement of Pres. Travis's "plea for raising awareness on sexual harassment at John Jay College and on the need to report any violation of the CUNY Sexual Harassment Policy" but he also criticizes the handling of the recent student sexual-harassment complaint against him. (Pl. Sur-Reply Addendum 2).[33] None of this constitutes opposition to a violation of Title VII or related statutes. Nonetheless, he does refer in passing to an incident from 1997 (13 years earlier) in which he assertedly heard "inappropriate remarks against Puerto Ricans", and he noted that "[t]he person in question still remains in the job." (Pl. Sur-Reply Addendum 2 at p. 3). Accordingly, that communication may be viewed as protected conduct. Finally, on or about May 10 or 15, 2011 he filed a charge with the EEOC complaining of national-origin and age discrimination as well as retaliation. (Id. at 000057-99).[34]

Plaintiff also cites a litany of alleged adverse actions undertaken against him by various of the defendants within the

---

[33] In this email, plaintiff also generally complains about what he perceives to be John Jay College's disproportionate emphasis on sexual harassment prevention, in contrast with employment discrimination policies he views as "lag[ing] behind." While, in this respect, it is unclear whether plaintiff was challenging what he perceived -- reasonably or otherwise -- to be unlawful conduct, as we note above, sending this letter can and should be viewed as a protected action.

[34] We assume, purely for present purposes, that plaintiff had a good-faith and reasonable belief that there was a basis for his complaint of discrimination.

limitations period. First, he notes that on April 29, 2010 defendant Montalban pressed a formal accusation against him under the CUNY Policy of Sexual Harassment, an action that occurred eight days after he had called GSUC's President Kelly's attention to discriminatory practices in CUNY's music program. (Id. at 000036). Second, he complains that at some subsequent point defendant Travis retaliated against him by accepting Ms. Montalban's "biased, unfounded and exaggerated" report of plaintiff's sexual harassment of a student. (Id. at 000052). Third, he asserts that in October 2010 various defendants pressed for, or ordered, a decision not to reappoint him to his then-current teaching positions, apparently at John Jay. (Id. at 000052-53). Fourth, somewhat contradictorily, he alleges that defendant Isabel Martinez observed a class that plaintiff taught on April 4, 2011 and then issued a critical evaluation that distorted facts, and he implies that this assessment resulted in, or contributed to -- or possibly served as a post hoc rationalization for -- the April 2011 decision to terminate plaintiff from two John Jay positions. (Id. at 000053, 000061). Fifth, he notes that John Jay in fact declined in April 2011 to renew his position at the college. (Id. at 000061-62). Sixth, plaintiff cites his failed January 2011 effort to obtain an already filled teaching position in the Graduate School. (Id. at 000061). Seventh, he recounts his inability to obtain the posted

67

Distinguished Lecturer teaching position at CENTRO in or about September 2011. (Id. at 000054, 000084-88). Eighth, plaintiff alleges that in June 2011 defendant Jose de Jesus retaliated against him by refusing him -- apparently on one occasion -- a key for his assigned editor's office at CENTRO. (Id. at 000054). Ninth, plaintiff points to the suggestion in June 2011 by Dr. Edwin Melendez, the head of CENTRO, that plaintiff should leave his editorial job at the Center and his September 2011 suggestion that plaintiff focus on getting his doctoral degree. (Id. at 000053-54, 000087). Finally, plaintiff complains that at some unspecified time defendant Matthew Schoengood, then Vice President of Student Affairs, ignored a letter written by someone else that alluded to plaintiff's complaints, ignored plaintiff's request to have external readers for his dissertation, and refused to let him enroll as a student for the Spring 2010 semester. (Id. at 000054-55).[35]

In seeking dismissal of the retaliation claims on the basis of lack of "plausibility," defendants press two arguments. First, they assert that plaintiff failed to draw a connection between his complaints to the University and the decision not to re-hire or promote him. (Defs. Mem. 19). Second, they argue that while

---

[35] We omit description of various allegations by plaintiff that a number of other CUNY employees did not respond to unspecified letters of complaint that he allegedly sent to them. (E.g., id. at 000051-52, 000055).

plaintiff mentioned the alleged letters and complaints that he had written during his time at CUNY, it is not clear that the subjects of those complaints were related to claims of discrimination. (Id.). According to defendants, the closest plaintiff comes to asserting a claim of retaliation is when he alleges that he told defendant Dr. Melendez in 2011 that CUNY was discriminating against him, and that sometime afterward he was not given an interview for the CENTRO position or permitted to use the editorial office at CENTRO. (Id.). Defendants also argue that there is no evidence suggesting that those actions would not have been taken but for the fact that plaintiff had engaged in a protected activity. (Id. at 19-20).

We focus first on plaintiff's potentially viable retaliation claims. As noted, he alleges that eight days after his April 21, 2010 letter to GSUC Pres. Kelly, defendant Montalban issued a report apparently finding plaintiff responsible for some form of misconduct -- unidentified by plaintiff -- based on a student's earlier sexual harassment complaint, and that John Jay Pres. Travis later "accepted" the report. (Connell Decl. Ex. A at 000036, 000052). It is at least arguable that a finding of misconduct on the basis of such a student complaint would be a sufficiently severe blow to an academic's standing in the

University community -- even if it has no direct official consequences -- that it may qualify as an adverse action under Burlington.[36] Moreover, in view of the fact that Ms. Montalban issued the report only eight days after the "protected activity" by plaintiff, the complaint suffices to plead enough for a permissible inference of at least an arguable connection.[37] Finally, although the release and approval of the report occurred outside the Title VII limitations period, these events remain

---

[36] On its face, Burlington appears to stand for the proposition that -- in the context of retaliation claims -- adverse consequences need not be concrete to amount to violations of Title VII. See Burlington, 548 U.S. at 67 ("We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.'"). We acknowledge, however, that courts in this Circuit have had some trouble applying this plaintiff-friendly standard with uniformity. See, e.g., Bowen-Hooks v. City of New York, __ F. Supp. 2d __, 2014 WL 1330941, *31 (E.D.N.Y. March 31, 2014) (discussing the intra-Circuit conflict). Compare, e.g., Ragin v. East Ramapo Cent. Sch. Dist., 2010 WL 1326779, *17 (S.D.N.Y. March 31, 2010) ("[A] negative or critical evaluation will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences.") with Siddiqi v. N.Y.C. Health and Hosp. Corp., 572 F. Supp. 2d 353, 371 (S.D.N.Y. 2008) ("Negative performance reviews, standing alone, can be considered an adverse employment action."). In any case, here, plaintiff seems to imply that -- with regard to the Montalban report, for example -- there were indeed concrete adverse consequences that arose from being negatively evaluated. (See Connell Decl. Ex. A at 000091-92) (implying a connection between the Montalban report and his termination from John Jay College). Thus, a liberalized reading of plaintiff's pleading -- as is warranted for a pro se plaintiff in the face of a Rule 12(b)(6) motion -- reveals that, even under the strictest interpretation of Burlington, these allegations pass pleading muster.

[37] We note that plaintiff does not explicitly plead that Ms. Montalban knew of the letter to Pres. Kelly, and there may well be reason to doubt that she did -- she was the Affirmative Action Officer at John Jay whereas Kelly was the President of GSUC. (Connell Decl. Ex. A at 000037, 000052). Given the required liberality with which we must read the pleading under Rules 8 and 12(b)(6) and plaintiff's pro se status, however, that question should be left for evidentiary development. See also Summa, 708 F.3d at 125-26 (knowledge of one official of protected conduct may be imputed to the organization).

70

timely under the State and City limitations periods.[38]

Plaintiff mentions, albeit in brief and unenlightening terms, that a number of defendants recommended (or directed) in October 2010 that he should not be reappointed to his position as an adjunct lecturer, apparently at John Jay. (Id. at 000037-38). He does not offer any other details to support his conclusory assertion that his April 2010 communication to Pres. Kelly at GSUC triggered these recommendations (or directives) at John Jay. Moreover, his pleading at other points says that John Jay did not decide to refuse a renewed contract until April 2011. (Id. at 000061).[39]

Plaintiff's next colorable citation of an adverse action is the refusal of the GSUC to appoint him to a Graduate School teaching position in January 2011, a few months after he had mentioned discrimination at John Jay to Pres. Travis. (Id. at 000061). In this case, however, plaintiff himself alleges that the position had initially been filled the prior month, and that he did not apply until after that step had already been taken.

---

[38] As will be discussed infra pp. 74-77, the substance of retaliation claims under Title VII and under the State and City Human Rights Law is identical for our purposes. For clarity's sake, however, we addressed the Montalban report and its factual sufficiency here.

[39] For present purposes, we need not address whether a recommendation of non-renewal for a non-tenured position might -- depending on the source -- amount to a sufficiently adverse action for a retaliation claim.

(Id.). This alone undercuts the plausibility of his explicit assumption that he was denied the appointment for any reason that would trigger Title VII protection.[40] In short, this action -- as pled -- does not permit a viable retaliation claim.[41]

Plaintiff next targets the events of April 2011, when his class was observed by Ms. Martinez, who prepared an apparently negative evaluation; apparently, in the wake of that assessment his position was not renewed. (Id. at 000053). The negative evaluation was not an adverse employment action, but it might arguably constitute a material adverse action for retaliation-claim purposes, since, in context, it posed a serious threat -- according to plaintiff ultimately realized -- that his teaching position would be imperilled.[42] In any event, that same month John Jay decided not to renew his contract (Id. at 000061), whether as a result, or partial result, of that class-performance assessment (id. at 000053) or in part because of the Montalban report from April 2010 (id. at 000036) or, arguably, because

---

[40] As noted, plaintiff also states at another point that he contacted GSUC about the position in December 2010. (Connell Decl. Ex. A at 000064, 000068). This contradiction undercuts the plausibility of the claim, although the inconsistency could be remedied by repleading. (See infra pp. 88-90).
[41] We also note that plaintiff fails to suggest -- other than in conclusory terms, if at all -- that the GSUC decision-makers had reason to know of plaintiff's letter to the president of John Jay. (Although plaintiff might theoretically argue that this December/January episode reflected retaliation for his April 21, 2010 letter to GSUC Pres. Kelly, that would stretch the temporal basis for inferring retaliatory animus to the breaking point.)
[42] See supra p. 70 n.36.

plaintiff had allegedly complained five months before to John Jay Pres. Travis about discrimination and the inadequacy of the school's anti-discrimination and affirmative-action programs. (Id. at 000061). This congeries of allegations -- in substance, that plaintiff's job position was terminated in retaliation for protected activity -- is sufficient to pass pleading muster.

Following plaintiff's filing of his EEOC charge in mid-May 2011, he alleges, he was denied a posted teaching position at CENTRO (id. at 000054, 000084-85) and pressured by the head of CENTRO to leave his editorial position there.[43] (Id. at 000093). We infer, for pleading purposes, that the CENTRO decision-makers were aware of the EEOC filing[44], and, given the timing (plaintiff was interviewed by the CENTRO search committee four months after his initial EEOC filing (id. at 000085)) and the alleged irregularities in the hiring process[45], his retaliation claim premised on this sequence is plausible.

Finally, plaintiff lists a set of job applications that he sent to various CUNY institutions in the wake of his termination

---

[43] Plaintiff never makes clear whether he left that position at the alleged urging of Mr. Melendez.
[44] Indeed, some of plaintiff's later EEOC filings concerned events at CENTRO. (Id. at 000084-88).
[45] As noted, these include the change in the posted hiring criteria and the freezing of the process after plaintiff was interviewed and recommended by the search committee for further interviews. (Id.).

at John Jay, and he may be heard to argue that his failure to
obtain any interviews was retaliatory. (Id. at 000096-97). In
view of the absence of any explanation by him of what
qualifications -- if any -- he had for the subjects he was
seeking to teach or any suggestion that the various far-flung
schools' decision-makers had any reason to know of his protected
activity, this implicit claim -- nowhere mentioned in the body of
the complaint and only summarily referred to in the EEOC filing -
- is not plausible as pled.[46]

c. The Claims Under the NYSHRL and the NYCHRL

Plaintiff pursues parallel claims for discrimination and
retaliation under both the NYSHRL and the NYCHRL. There is no
question that claims under the NYSHRL, whether for discrimination
or for retaliation, are analyzed under the same standards as the
equivalent federal claims, whether under Title VII or the ADEA.
See, e.g., Brown v. Daikin America, Inc., 756 F.3d 219, 225-26 &
n.7 (2d Cir. 2014); Summa, 708 F.3d at 125; Tomassi, 478 F.3d at

_____

[46] We note that at one point plaintiff asserts, as a potential retaliatory
action by CUNY, its report to the New York State Labor Department in July 2011
that plaintiff had been overpaid $286.00 based on its record showing that
plaintiff had worked one or three days, a representation on which plaintiff
recites that CUNY prevailed before the Labor Department. (Connell Decl. Ex. A
at 000092). This assertion does not reflect adverse action of such severity as
would be likely to deter a reasonable employee (or former employee) from
engaging in protected conduct, and hence does not amount to a colorable claim
of retaliation.

115. Hence, we recommend disposition of the NYSHRL claims in accordance with the resolution of the federal claims.

As for claims under the NYCHRL, that statute embodies, in certain respects, a more lenient standard than Title VII. See, e.g., Mihalik v. Credit Agricole Cheuvreux, 715 F.3d 102, 108-09 (2d Cir. 2013); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277-79 (2d Cir. 2009) (discussing impact of NYC Restoration Act & quoting Williams, 61 A.D.3d at 66-69, 872 N.Y.S.2d at 31). Specifically, in lieu of the interpretation of the adverse-employment-action requirement embodied in Title VII and other federal statutes, a plaintiff seeking to sustain a claim of employment discrimination under the NYCHRL "must only show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." Dimitracopoulos, 2014 WL 2547586 at *12; see, e.g., Gorokhovsky .v New York City Housing Auth., 552 F. App'x 100, 102 (2d Cir. 2014); Sotomayor, 862 F. Supp. at 258; Williams v. Regus Mgt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011). That said, even under this looser standard, negative evaluations, as well as such actions as undesired scheduling of work assignments, and routine other burdens placed on the employee are not adverse employment actions. See, e.g., Dimitracopoulos, 2014 WL 2547586 at *12.

75

As for claims of retaliation, although some courts have occasionally suggested that the standard under the current NYCHRL may be more flexible than under Title VII, see, e.g., Pacheco v. Comprehensive Pharmacy Servs., 2013 WL 6087382, *16 (S.D.N.Y. Nov. 19, 2013); Sotomayor, 862 F. Supp. 2d at 262, as articulated, the requirement of an adverse action under City law appears to be roughly equivalent to federal law, that is, the action must be of sufficient severity that it "was 'reasonably likely to deter a person from engaging in a protected activity.'" Pacheco, 2013 WL 6087382 at *16 (quoting Costello v. N.Y. State Nurses Ass'n, 783 F. Supp. 2d 656, 676 (S.D.N.Y. 2011); Williams, 61 A.D.3d at 70-71, 872 N.Y.S.2d at 34). Compare Burlington, 548 U.S. at 68 ("challenged action . . . might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.").[47] Indeed, the Second Circuit has at least suggested that there is likely no significant difference betweem the two standards, although they are formulated in slightly different terms. See Fincher v. Depository Trust & Clearing Group, 604 F.3d 712, 723 (2d Cir. 2010).

In this case, the variations from federal standards that are

---

[47] The Supreme Court observed that it referred to "material adversity because we believe it is important to separate significant from trivial harms." Burlington, 548 U.S. at 68 (emphasis in original). As noted, under the NYCHRL "trivial, insubstantial or petty" harms are not covered either. Dimitracopoulos, 2014 WL 2547586 at *12 (addressing discrimination claim).

embodied in the NYCHRL in the wake of the Restoration Act do not dictate a different result from our conclusions regarding plaintiff's claims under Title VII, the ADEA and the NYSHRL. The complaint is entirely silent as to any fact suggestive of age animus and, for reasons noted, it fails to present a plausible set of factual allegations of national-origin animus. See generally Ben-Levy v. Bloomberg LLP, 518 F. App'x 17, 20 (2d Cir. 2013) (NYCHRL "still requires a showing of some evidence from which discrimination can be inferred").[48] Finally, insofar as plaintiff alleges that he was subjected to retaliatory adverse actions within the limitations periods, his claims are viable under the NYCHRL to the same extent as they survive a Rule 12(b)(6) challenge under Title VII and the NYSHRL.

### d. Plaintiff's Other Possible Claims

In plaintiff's opposition papers, he asserts that in defendants' motion they "exclude from dismissal various matters included in the formal complaint: torts; sabotage to Plaintiff's professional development; IIED; conspiracy; copyright

---

[48] Rules 8 and 12(b)(6) extend to claims under state as well as federal law. See, e.g., Warmann v. Excel Dentistry, 2014 WL 846723, *2 (S.D.N.Y. Feb. 25, 2014) (applying Rule 12(b)(6) standards to NYSHRL & NYCHRL claims); Harris v. NYU Langone Med. Ctr., 2014 WL 3487032 (S.D.N.Y. July 9, 2013) (applying Rules 8, 12(b)(6) & 15 to NYSHRL & NYCHRL claims). Necessarily, then, so does the plausibility requirement.

77

infringements and attempted copyright infringement; forgery and destruction of documents." (Pl. Oppos. 3). He thus implies that he has sought to state claims under these rubrics. We have already addressed his copyright allegations. As for the other items to which he refers, although not articulated in those terms in his pleading, we address them here, see, e.g., Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (pro se plaintiff's papers to be read liberally); Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (correct legal label not required to survive dismissal; factual allegations control). We conclude that none of these items is viably pled.

### (a). Intentional Infliction of Emotional Distress ("IIED")

Under New York law, a claim of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993); Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996); Silver v. Kuehbeck, 2005 WL 2990642, *7 (S.D.N.Y. Nov. 7, 2005). Moreover, this claim is subject to a one-year statute of limitations. See, e.g., Havell

v. Islam, 292 A.D.2d 210, 210, 739 N.Y.S.2d 371, 372 (1st Dep't 2002); Gallagher v. Directors Guild of America, Inc., 144 A.D.2d 261, 262, 533 N.Y.S.2d 863, 864-65 (1st Dep't 1988); Cuellar v. Love, 2014 WL 1486458, *5 (S.D.N.Y. April 11, 2014); Santan-Morris v. New York Univ. Med. Ctr., 1996 WL 709577, *2 (S.D.N.Y. Dec. 10, 1996); Neufeld v. Neufeld, 910 F. Supp. 977, 981 (S.D.N.Y. 1996).

Plaintiff filed his complaint with the Pro Se Clerk on March 26, 2013, but his last alleged contact with CUNY appears to have occurred in 2011. Necessarily, then, the actions of which he complains -- with the possible exception of the release of the Ruck report, allegedly on about May 15, 2012 (Connell Decl. Ex. A at 000050) -- are outside the statute of limitations for an IIED claim, which must therefore be time-barred.

In any event, even if we were to ignore the time-bar to this unpled claim, it would fail as a matter of pleading. To satisfy the requirement of "extreme and outrageous conduct", the plaintiff must allege "conduct [that is] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded s atrocious, and utterly intolerable in a civilized society." Stuto v. Fleishman, 164 F.3d

820, 827 (2d Cir. 1999) (quoting Howell, 81 N.Y.2d at 122, 596
N.Y.S.2d at 353). Plainly, the termination of plaintiff's
teaching positions at CUNY, and the refusal to hire him for
academic jobs, even if done for discriminatory or retaliatory
purposes, do not remotely meet such a stringent standard. See,
e.g., Martin v. Citibank, 762 F.2d 212, 220 (rejecting IIED
claim; during an investigation into missing funds plaintiff was
selected for polygraphing based on her race and was forced to
resign because of harassment); Murphy v. Am. Home Prods. Corp.,
58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983) (plaintiff was
transferred and demoted for reporting massive fraud in employer's
accounting procedures, told that he would never advance, was
discharged and ordered to leave, and was forcibly and publicly
escorted from the building when he returned to pick up his
belongings which were subsequently dumped into the street);
Belanoff v. Grayson, 98 A.D.2d 353, 355, 357-58, 471 N.Y.S.2d 91,
93, 94 (1st Dep't 1984) (unjustified unfavorable performance
reviews were prepared after plaintiff's marriage; subsequent
suspension and termination followed commencement of legal
action); Lewis v. New York Telephone Company, 643 F. Supp. 654,
656, 660 (S.D.N.Y. 1984) (promotion denied based on race;
employer made unjustified accusation of stealing records and
cheating on promotion test). Defendants' statements and actions,
as alleged by plaintiff, do not approach outrageous or extreme

behavior.

Given these evident failings in plaintiff's pleading, we need not tarry over his inability to satisfy other elements of the claim. We only note briefly that plaintiff must demonstrate "severe emotional distress" and a "causal connection" between the distress and the alleged misconduct. See Howell, 81 N.Y.2d at 121, 596 N.Y.S.2d at 353. To qualify, "the emotional distress suffered by the plaintiff must be so severe that no reasonable [person] could be expected to endure it." Wiener v. Unumprovident Corp., 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002). While the loss of a job and failure to obtain replacement employment from the same university is undoubtedly distressing, the complaint never hints that plaintiff suffered the requisite excruciating distress, much less that defendants intended to cause such distress.

Accordingly, the IIED claim -- to the extent ostensibly pled -- must be dismissed.

(b). Sabotage of Professional Development

Plaintiff also refers to defendants having damaged his professional development, presumably by not awarding him a doctorate and not promoting his academic career. As noted, his failure to identify a cognizable legal theory to undergird these allegations is not fatal to his pleading. See, e.g., Albert, 851 F.2d at 571 n. 3 (citing Newman v. Silver, 713 F.2d 14, 15 n. 1 (2d Cir. 1983)) Nonetheless, in substance he is simply complaining about the fallout of conduct by defendants that -- at most -- would be covered by the anti-discrimination and anti-retaliation provisions previously discussed. There simply is no basis to invent (or discern) any separate and viable legal theory.

(c). Conspiracy

Although plaintiff mentions in passing in his motion papers that he is asserting a claim of conspiracy, the only explicit reference to a conspiracy in the complaint is his assertion that defendants Manuel and Blum conspired to steal his intellectual property. (Connell Decl. Ex. A at 000006, 000045-46). New York law does not recognize an independent tort of conspiracy. See, e.g., Hoeffner v. Orrick, Herrington & Sutcliffe LLP, 85, A.D.3d

457, 458, 924 N.Y.S.2d 376, 377 (1ˢᵗ Dep't 2011); <u>Kestenbaum v.</u>
<u>Suroff</u>, 268 A.D.2d 560, 561-62, 704 N.Y.S.2d 260, 262 (2d Dep't
2000); <u>Rivera v. Greenberg</u>, 243 A.D.2d 697, 698, 603 N.Y.S.2d
628, 629 (2d Dep't 1997). Thus, to the extent that plaintiff may
be left with a claim for infringement of intellectual property,
he fails to plead a plausible factual basis for it.[49] Moreover,
if the claim were deemed to be asserted under New York common law
-- whether a claim for unfair competition, see, <u>e.g.</u>, <u>Ace Arts,</u>
<u>LLC v. Sony/ATV Music Pub., LLC</u>, __ F. Supp. 3d __, 2014 WL
4804465, *12 (S.D.N.Y. Sept. 26, 2014) (summarizing New York
common law unfair competition claims), or for common law
copyright infringement -- it too may well be precluded by the
statute of limitations. See, <u>e.g.</u>, <u>Zinter Handling, Inc. V.</u>
<u>General Elect. Corp.</u>, 101 A.D.3d 1333, 1337, 956 N.Y.S.2d 626,
630 (3d Dep't 2012) (three-year statute for unfair-competition
claims). <u>Compare Urbont v. SONY Music Ent.</u>, 863 F. Supp. 2d 279,
286-88 (S.D.N.Y. 2012) (three-year limitations period for common-
law copyright claim) (discussing <u>Sporn v. MCA Records, Inc.</u>, 58
N.Y.S.2d 482, 462 N.Y.S.2d 413 (1983)) <u>with Capital Records, LLC v.</u>
<u>Harrison Greenwich, LLC</u>, 44 Misc.3d 202, 208, 984 N.Y.S.2d 274,
277-79 (Sup. Ct. N.Y. Cty. 2014) (suggesting six-year limitations

---

[49] As we noted above, plaintiff offers a potpourri of shifting complaints about
the book that Prof. Manuel published, but in substance they seem to amount to
criticism of some of Prof. Manuel's stated views -- which supposedly competed
with some of plaintiff's opinions (Connell Decl. Ex. A at 000048) -- and
plaintiff's unhappiness that Prof. Manuel's name supposedly appeared first in
listings of co-authors. (Pl. Sur-Reply 9-10).

period). See generally Melcher v. Greenberg Traurig, LLP, 23 N.Y.3d 10, 988 N.Y.S.2d 101 (2014).

### (d). Forgery and Destruction of Documents

Plaintiff's motion papers also mention "forgery and destruction of documents". (Pl. Oppos. 3). This appears to refer to an allegation in the complaint, couched in conclusory and speculative terms, that defendant Manuel was involved with the "probable destruction of evidence related with the case". (Connell Decl. Ex. A at 000045).

Spoliation does not itself provide an independent cause of action. See, e.g., Ortega v. City of New York, 9.N.Y.3d 69, 83, 845 N.Y.S.2d 773, 781 (2007). If a party destroys or conceals documents, that conduct may have consequences in a litigation that involves independent cognizable claims, see, e.g., West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779-80 (2d Cir. 1999), but such actions do not provide a basis for plaintiff to pursue a lawsuit absent bona fide legal claims. In any event plaintiff fails to plead any plausible facts to underpin such a theorized claim.

As for forgery, while such an act might conceivably provide

an element in an otherwise independent claim, plaintiff alleges
nothing that might constitute a factual basis for an assertion
that any defendant engaged in any form of forgery, much less that
it was accompanied by actions that give rise to a cognizable
claim.

### (e). The Individual Defendants

As noted, plaintiff has named no fewer than 22 individuals
as defendants in this case. Nonetheless, he does not specify
which claims he is pressing against which of these defendants.
Since defendants seek dismissal of all claims against all of
them, we address that question here.

Title VII and the ADEA do not provide for individual
liability when the employer is a corporation or other entity.
See, e.g., Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir.
2012) (Title VII); Thomas v. New York City Dep't of Educ., 938 F.
Supp. 2d 334, 354-55 (E.D.N.Y. 2013) (ADEA). Hence, plaintiff's
claims under these statutes must be dismissed as against the
individuals even if some of those claims might otherwise be at
least colorable.

Unlike the federal statutes, the NYSHRL allows for the

85

imposition of liability on individual defendants under two provisions: sections 296(1) (direct liability), and 296(6) (indirect liability). Direct liability under N.Y. Exec. Law § 296(1) lies only if a defendant "actually participates in the conduct giving rise to discrimination," Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009) (quoting Feingold, 366 F.3d at 157), and is "limited to individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees." Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 199 (E.D.N.Y. 2007) (internal quotation marks omitted); see also Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660-61 (1984) (per curiam); Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) (citing Patrowich) (an individual can only be held liable as an "employer" pursuant to § 296(1) where he or she is "shown to have an[] ownership interest in [the business employing the plaintiff] or [] power to do more than carry out personnel decisions made by others"). As for indirect liability under section 296(6), it may be imposed upon a defendant who has "aid[ed] and abet[ted]" section 296(1)(a) violations. N.Y. Exec. Law § 296(6). Thus, to be found liable under § 296(6), an individual need not have supervisory or hiring-and-firing power, but still must have "actually participat[ed] in the conduct giving rise to [the claim of] discrimination." Feingold, 366 F.3d at 157.

The NYCHRL also provides for direct individual liability, making it unlawful for "an employer <u>or an employee or agent thereof</u>, because of the actual or perceived . . . national origin . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)(a) (emphasis added). Thus, the NYCHRL provides for individual liability "regardless of ownership or decision-making power." <u>Banks</u>, 475 F. Supp. 2d at 200.

Defendants argue that plaintiff fails to meet the "aid and abet" standard under section 296(6), which provides that liability against individual defendants can only be found if there is proof suggesting that they "actually participate[d] in the conduct giving rise to the discrimination." (Defs. Mem. 20-21). <u>See</u>, <u>e.g.</u>, <u>Feingold</u>, 366 F.3d at 159-60 (citing cases); <u>see also</u> <u>Sowemimo v. D.A.O.R. Sec., Inc.</u>, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999).

As noted, the only currently viable claims under the NYSHRL and the NYCHRL are those premised on the allegedly retaliatory termination of plaintiff's positions at John Jay amd the failure to hire him at CENTRO in the Fall of 2011. Since the one colorable theory for liability is premised on retaliation, we may

readily conclude that plaintiff fails to state a claim against the individual defendants other than John Jay Pres. Travis (for termination of plaintiff's positions at John Jay), and CENTRO head Edwin Melendez for the failure to hire plaintiff at CENTRO, together with Isabel Martinez for her arguable contribution to the termination by virtue of her negative class-performance assessment, and Silvia Montalban for her 2010 report accusing plaintiff of sexual-harassment-related misconduct.

## E. Dismissal With or Without Prejudice

As a general matter, when a claim or entire complaint is dismissed for failure to state a claim, the court usually permit the plaintiff at least one opportunity to replead, at least if it is reasonably conceivable that he might be able to formulate a cognizable claim or set of claims. This is particularly true if the plaintiff is an untutored pro se litigant. See, e.g., Morales v. Mackalm, 278 F.3d 126, 132-33 (2d Cir. 2002), abrogated on other grounds by Porter v. Nussle, 534 U.S. 516 (2002); Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795-96 (2d Cir. 1999).

In this case, based on our assessment of defendants' motion, it is evident that plaintiff's claims that are time-barred under Title VII, the ADEA, the NYSHRL and the NYCHRL -- that is,

88

federal claims that arose prior to July 19, 2010 and State and City claims that arose before March 26, 2010 -- must be dismissed with prejudice. All claims under the ADEA as asserted against CUNY must also be dismissed with prejudice. All timely claims asserted against CUNY under the NYSHRL and the NYCHRL must be dismissed with leave to refile in state court. All claims asserted for actions by any individual defendants other than participating in or causing plaintiff's non-renewal by John Jay in 2011 or the refusal to hire him by CENTRO in the Fall of 2011 should be dismissed with prejudice. All timely claims involving the 2011 John Jay non-renewal(s) or the 2011 failure to hire by CENTRO should be dismissed without prejudice as against all the individual defendants except for defendants Travis, Melendez, Martinez and Montalban. All timely claims for terminations or for failure to hire plaintiff that rest on alleged national-origin animus should be dismissed without prejudice to repleading if plaintiff can allege a properly formulated cause of action.

In view of the foregoing recommended disposition, plaintiff's surviving claims would be for retaliation under Title VII, the NYSHRL and the NYCHRL based on plaintiff's 2011 termination by John Jay and the 2011 failure to hire him by CENTRO. The Title VII claims would be asserted against CUNY alone. The claims under the State and City statutes would be

asserted against CUNY and defendants Travis, Melendez, Martinez and Montalban. To the extent that repleading is permitted, it should be required to be made within 30 days of dismissal.

### CONCLUSION

For the reasons noted, we recommend defendants' motion to dismiss be granted in part and denied in part, as specified.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Paul A. Crotty, Room 1350, 500 Pearl Street, New York, New York, 10007-1312, and to the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections, both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**Dated: New York, New York**
   **November 7, 2014**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report & Recommendation have been mailed
today to:

Mr. Edgardo Diaz Diaz
130 West 67th Street Apt. 4B
New York, New York 10023

Monica Connell, Esq.
Assistant Attorney General
 for the State of New York
120 Broadway
New York, New York 10271